Filed 7/27/17

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| FRIENDS OF THE EEL RIVER, | ) | |
| | ) | |
| Plaintiff and Appellant, | ) | S222472 |
| v. | ) | |
| | ) | Ct.App. 1/5 A139222 |
| NORTH COAST RAILROAD | ) | |
| AUTHORITY et al., | ) | |
| | ) | Marin County |
| Defendants and Respondents; | ) | Super. Ct. No. CV1103605 |
| | ) | |
| NORTHWESTERN PACIFIC | ) | |
| RAILROAD COMPANY, | ) | |
| | ) | |
| Real Party in Interest | ) | |
| and Respondent. | ) | |
| | ) | |
| | ) | |
| CALIFORNIANS FOR | ) | |
| ALTERNATIVES TO TOXICS, | ) | |
| | ) | |
| Plaintiff and Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | Ct.App. 1/5 A139235 |
| NORTH COAST RAILROAD | ) | |
| AUTHORITY et al., | ) | Marin County |
| | ) | Super. Ct. No. CV1103591 |
| Defendants and Respondents; | ) | |
| | ) | |
| NORTHWESTERN PACIFIC | ) | |
| RAILROAD COMPANY, | ) | |
| | ) | |
| Real Party in Interest | ) | |
| and Respondent. | ) | |

In this case we decide whether federal law, the ICC [Interstate Commerce Commission] Termination Act of 1995 (Pub.L. No. 104-88 (Dec. 29, 1995) 109 Stat.

**SEE CONCURRING AND DISSENTING OPINIONS**

803) (ICCTA; see 49 U.S.C. § 10101 et seq.), preempts application of the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.), to a railroad project that has been undertaken by a state public entity, defendant North Coast Railroad Authority (NCRA), along with lessee real party in interest, Northwestern Pacific Railroad Company (NWPCo), a private entity.

The Court of Appeal determined that "CEQA is preempted by federal law when the project to be approved involves railroad operations." We conclude that the ICCTA is not so broadly preemptive.

True, the ICCTA contemplates a unified national system of railroad lines subject to federal, and not state, regulation. Indeed, it appears settled that the ICCTA *would* preempt state regulation in the form of the state's imposition of environmental preclearance requirements on a privately owned railroad that prevented the railroad from operating. But in this case we must explore the application of the ICCTA preemption clause to the state's decisions with respect to its own subsidiary governmental entity in connection with a railroad project owned by the state.

When the project is owned by the state, the question arises whether an act of self-governance on the part of the state actually constitutes regulation at all within the terms of the ICCTA. Even though the ICCTA applies to state-owned rail lines, in the sense that states as owners cannot violate provisions of the ICCTA or invade the regulatory province of the federal regulatory agency, this is not the end of the question. In our view, the application of state law to govern the functioning of subdivisions of the state does not necessarily constitute regulation. To determine the reach of the federal law preempting state regulation of a state-owned railroad we must consider a presumption that, in the absence of unmistakably clear language, Congress does not intend to deprive the state of sovereignty over its own subdivisions to the point of upsetting the usual constitutional balance of state and federal powers.

2

There is another aspect of the state's status as the owner of the railroad that is significant. The ICCTA, although it contemplates a rail system that is unified on a nationwide basis, also contemplates a rail industry that is subject to relatively limited regulation on the part of the federal government. Where the federal law has deregulated, the states are not free to fill regulatory voids. But the ICCTA's deregulatory feature also frees railroad owners to make market-based decisions and not suffer an undue level of regulation of *any* kind. In the area of activity in which a private owner is free from regulation, the private owner nonetheless ordinarily would have internal corporate rules and bylaws to guide those market-based decisions. In other words, a private conglomerate that owns a subsidiary railroad company is not required to decide whether to go forward with a railroad project, for example, by tossing a coin. Rather, it can make the decision based on its own corporate guidelines, and require its rail company to do the same.

When we consider that the ICCTA has a deregulatory purpose that leaves railroad owners with a considerable sphere of action free from regulation, we see that the state, as owner, must have the same sphere of freedom of action as a private owner. But unlike other owners, to act in that deregulated sphere, the state ordinarily acts through its laws. In the circumstances here, those state laws are not regulation in the marketplace within the meaning of the ICCTA, but instead are the expression of the state's choice as owner within the deregulated sphere. This is how the deregulatory purpose of the ICCTA necessarily functions when state-owned, as opposed to privately owned, railroad lines are involved.

We acknowledge that, like the private owner, the state as owner cannot adopt measures of self-governance that *conflict* with the ICCTA or invade the regulatory province of the federal regulatory agency. But there is a sphere of regulatory freedom enjoyed by owners, and there are at least two specific areas of regulatory freedom that are present in this case. Specifically, environmental decisions concerning track repair on an

3

existing line and the level of freight service within certain boundaries to be offered on an existing line appear to be within the regulatory sphere left open to owners. We conclude that this freedom belongs to the state as owner, as well, and under these circumstance, the ICCTA does not preempt the application of CEQA to this project.

## I.  Factual and Procedural Background

An intrastate railroad line runs from Lombard, in Napa County, north to Arcata, in Humboldt County. The northern, or so-called Eel River division of the line, is quite decayed and runs through the environmentally sensitive Eel River Canyon. The southern, or so-called Russian River division of the line, also formerly in poor condition, runs between a southern terminus in Lombard north to Willits, in Mendocino County. There is a connection to an interstate rail line at Lombard. The project under review involves resumption of freight service in the Russian River division.

### A.  History of public ownership

Public ownership of the line is relatively new. Historically, private railroad companies owned the tracks and operated service on both the northern and southern divisions of the line. These companies eventually failed economically. The state Legislature was concerned that service on the line would be permanently abandoned. To avoid this outcome, particularly the loss of freight service — a result that was considered damaging to the economy of the counties through which the line ran — the Legislature decided that the investment of public monies would be necessary. (Gov. Code, §§ 93001, 93003; see also Historical and Statutory Notes, 37A, pt. 3 West's Ann. Gov. Code (2005 ed.) foll. former §§ 93030-93034, p. 296.)

In late 1989, the Legislature created NCRA (Gov. Code, § 93010), giving the agency the power to acquire necessary property and to operate a railroad on the line, and also to select a public or private entity to actually operate transportation services on the line.

4

With state funds, NCRA acquired ownership or, on some sections, easement rights over the railroad line, including the Russian River and Eel River divisions, between 1990 and 1996.[1]

### B. Public funding for repairs and NCRA's repeated written commitments regarding CEQA compliance

In 2000 the Legislature appropriated funds to the state Department of Transportation for allocation as directed by the California Transportation Commission, including $60 million to NCRA to "repair and upgrade track to meet Class II (freight) standards." (Gov. Code, § 14556.40, subd. (a)(32).) Of this, approximately $4 million was allocated to environmental remediation.

From 2001 to 2006 in various agreements and plans, NCRA committed to CEQA compliance. In 2001 the state Department of Transportation entered into a funding master agreement with NCRA to run through 2010, naming a number of state funding sources, and binding NCRA as recipient to a number of terms, including, for example, compliance with state auditing rules; California Transportation Commission resolutions imposing environmental obligations; public contracting requirements; and nondiscrimination and disabled access requirements.

Significantly, as a condition of funding, one term of the master agreement stated that "[c]ompletion of the environmental process ('clearance') for project by recipient (and/or state if it affects a state facility within the meaning of the applicable statutes) is required prior to requesting project funds for right-of-way purchase or construction. No state agency shall request funds nor shall any state agency, board or commission

---

[1] The portion over which NCRA holds an easement for freight service belongs to another public agency devoted to commuter rail service (now named Sonoma Marin Area Rail Transit, or SMART), while in turn SMART holds an easement for commuter rail service over portions of the line owned by NCRA.

authorize expenditures of funds for any project effort, except for feasibility or planning studies, which may have a significant effect on the environment unless such a request is accompanied by an environmental impact report [as] mandated by [CEQA]." (Some capitalization omitted.) Funding was also conditioned on completion of strategic and capital assessment plans. These also acknowledged that NCRA was required to comply with CEQA before approving or carrying out the project.

In its 2006 application to the state Department of Transportation for $31 million to bring the line up to certain standards, NCRA asserted that "appropriate CEQA and NEPA documentation will be prepared" and various state, federal, and local agencies approached for permits. Environmental obligations under CEQA and the National Environmental Policy Act (NEPA; 42 U.S.C. § 4321; et seq.) were repeatedly acknowledged and fulfillment of those obligations was noted in funding requests.[2]

A 2006 supplement to the master agreement between the state Department of Transportation and NCRA described the scope of the work to be financed to include

---

[2] In NCRA's 2002 capital assessment report, NCRA acknowledged that much of the line was "not in compliance with several state environmental regulations," a circumstance it also acknowledged eventually led to a 1999 consent decree with various state agencies. (See *post*, at p. 10.)

The capital assessment report described environmental compliance concerns, leading to a recommendation that "a combined document (CEQA and NEPA) be prepared and processed . . . that involves facility upgrades, landslide stabilization and reopening of the line . . . . The type of document recommended is an EIR prepared pursuant to [CEQA]." The capital assessment report also explained that "NCRA, as a state created railroad authority, is required to comply with the provisions of . . . CEQA prior to its decisions concerning . . . carrying out or approving a project."

The capital assessment report explained that NCRA had issued a notice of categorical exemption under CEQA for certain maintenance and repair of the track. But overall, the report concluded, the use of categorical exemptions under CEQA was considered unlikely to meet with approval by "state regulatory, funding, or trustee agencies." Step-by-step plans for the EIR process were described and consultation with approximately 30 federal, state, and local agencies was anticipated.

various obligations under CEQA, including preliminary project and scoping activities, draft environmental impact reports (EIRs), and a final EIR.

The NCRA administration and contracting policy manual also called for CEQA compliance: "As a public agency, [NCRA] is required to comply with the California Environmental Quality Act . . . . The Act requires public agencies to adopt a policy that serves to implement the CEQA for activities within the jurisdiction of the agency." Moreover, the manual represented, "[NCRA] adopts the Guidelines for the Implementation of the California Environmental Quality Act; California Code of Regulations, Title 14, Division 6, Chapter 3, Sections 15000-15387 and Appendices A-K ('CEQA Guidelines') in its entirety . . . ."

### C. *Agreement with private operator*

NCRA contracted with private corporations that were to actually operate freight service on the entire line, ending up in 2006 with an arrangement with NWPCo, the real party in interest in this litigation. The text of this 2006 "agreement for the resurrection of operations upon the Northwestern Pacific railroad line and lease" (some capitalization omitted) designated NCRA as the owner of the line, which was under a statutory duty to provide freight rail service on the line. NWPCo was designated a franchisee, selected to operate freight service on the line.

The agreement memorialized NWPCo's duty (under a certificate of convenience and necessity granted to it by the federal Surface Transportation Board) to provide safe, adequate, and efficient facilities and service. The agreement provided that NWPCo is the operator responsible for complying with federal and state safety regulations. Under the agreement, NWPCo leased portions of the Russian River division owned by NCRA and gained an assignment of portions of the line that NCRA held under an easement, with an option involving the northern sections of the line. The agreement was subject to a number of conditions, including "*NCRA having complied with the California*

7

*Environmental Quality Act . . . as it may apply to this transaction*." (Italics added.) The agreement had a term of five years with options to renew.

NCRA was responsible for restoring all portions of the line to a certain level of "utility." NCRA committed that all available public funds designated for restoration and improvement would be invested and that "[i]t shall be solely NCRA's responsibility to use its best efforts to seek public funding to reopen, rehabilitate, restore, and continue the level of utility of the [line]." NWPCo had no obligation to provide service before this was accomplished. "If, however, [NWPCo] elects to operate . . . over any portion of the [line] at a lesser Utility Level," then NWPCo was responsible for maintenance. NWPCo was to be the sole provider of freight service on the line, would manage and control train operations after service resumed, and generally would be responsible for maintenance after service commenced. NWPCo had authority to seek the relevant federal agency's permission to suspend or discontinue service if service were to become "not economical in consideration of traffic volumes" for it to perform its maintenance obligation, although NWPCo agreed not to seek authority to suspend or discontinue service without NCRA approval. "In the event that NCRA unsuccessfully opposes such suspension or discontinuance of service it may terminate this Agreement as to any section or any portion of a section of the . . . line necessary in its sole discretion to restore service to [that] portion of the . . . line . . . ."

### D. Regulation of the rail line

#### 1. Federal regulatory action and involvement of various state agencies

As defendants and real party in interest stress, the project falls within the regulatory authority of the federal agency charged with administration of the ICCTA. Accordingly, in 1996, NCRA filed a notice of exemption with the newly established Surface Transportation Board (STB) — the successor to the prior federal regulatory agency, the ICC. The 1996 notice of exemption produced an exemption from ordinary regulatory certification proceedings and permitted NCRA's acquisition of and operation

8

on the line.  (See 49 C.F.R. § 1150.41 (2016) [acquisition or operation by class III rail carrier].)

In 2001, the first private operator selected by NCRA filed its own notice of exemption with the STB, thereby permitting a change of operators from NCRA to the private company without further procedures.  (See 49 C.F.R. § 1150.31(a)(3) (2016) [exemption from certification procedure for change in operators].)[3]

This prior operator was succeeded by real party in interest, NWPCo.  In 2007 NWPCo filed its notice of exemption with the STB, permitting the change in operator along the Russian River division of the line without a certification procedure.  (See 49 C.F.R. § 1150.31(a)(3) (2016).)  In 2007, plaintiff Friends of the Eel River and others petitioned the STB to revoke the exemption.  The challengers complained that increased train traffic on the line would, under STB regulations, necessitate federal environmental review of the planned operation.  In rejecting the petition, the STB explained that the level of frequency of freight service being planned was below the STB's regulatory threshold triggering the need for federal environmental review.  It also noted that the ICCTA favors exemption from regulation whenever appropriate unless the STB has identified an abuse of market power.

Several other state and federal agencies have taken actions respecting the line.  Of note is safety regulation by the Federal Railroad Administration (FRA), an agency of the United States Department of Transportation charged with ensuring railroad safety.  In 1990, prior to state ownership, the FRA closed portions of the line because of safety

---

**3**    After this operator ceased service, but before real party in interest was certified, the STB was involved in resolving a shipper's action for damages against NCRA for failing to repair the line and reinstitute service, in violation of its duty as a common carrier.  First in 2005, and then in 2007, the STB denied the shipper's complaint in part because the agency accepted NCRA's explanation that it lacked adequate funds for repairs.

concerns arising from inadequate maintenance. Safety problems continued as the line suffered from deferred maintenance and inadequate capital investment. The Federal Emergency Management Agency (FEMA) also became involved after flooding damage caused additional problems. The FRA worked with the state Public Utilities Commission, but both agencies, along with FEMA, found that defective track conditions had not been corrected, and in 1998 the FRA shut down service all along the line. Repairs and operational improvements were made, and in May 2011, the FRA granted partial relief from its emergency order, permitting resumption of traffic on the southern portion of the line at issue in this litigation, but not on the northern section.

In addition, various state entities, including the Department of Fish and Wildlife and Department of Toxic Substances Control, along with the North Coast Regional Water Quality Control Board, investigated poor environmental conditions on the line, documenting that in undertaking repairs, NCRA failed to comply with state environmental statutes and regulations. They ultimately filed a complaint against NCRA for violation of the state Fish and Game Code, Health and Safety Code, and Water Code. In 1999 the parties entered into an elaborate consent decree binding NCRA to cease certain environmentally destructive practices and to undertake remediation.

### 2. Proceedings under CEQA

Over a period of years, NCRA, acting as lead agency, undertook the following procedures under CEQA.

In July 2007, NCRA submitted a notice of preparation of an EIR for the freight rail project that is the subject of this litigation. The notice described the project as involving the resumption of freight rail service on the Russian River division of the line, saying more specifically that (1) NCRA proposed a project to resume freight rail service on the Russian River division, and (2) that NWPCo, "NCRA's selected rail operator, proposes to resume the operations of freight service" on the line.

10

The initial study for the "Russian River Division Freight Rail Project" also described the project as NCRA's proposal to resume freight rail service and again it pointed to NWPCo's involvement as the actual operator that would resume freight service. The initial study also recounted NCRA's proposed "rehabilitation of its track, signals, embankments, and bridges," saying that some of these activities may cause a significant impact on the environment and would be analyzed in the EIR.

After public and agency consultation and scoping meetings, in March 2009 NCRA issued a draft EIR, again describing the project as NCRA's resumption of freight rail service on the Russian River division, with NWPCo designated as "NCRA's contract operator." The draft EIR noted that certain rehabilitation along the line had already been covered under a June 2007 notice of exemption, and that NCRA and NWPCo had been bound by an earlier consent decree as to that project.[4] The draft EIR also noted that NCRA and NWPCo were bound by the 1999 consent decree brought by the various state agencies (see *ante*, at p. 10), requiring them to prepare and implement waste clean-up plans, "conduct all rail operations in accordance with applicable environmental laws," and properly dispose of hazardous materials.

The draft EIR stated that NWPCo proposed to resume freight operations, and that resumption of rail service would serve statewide air quality goals and reduce diesel truck

---

[4] In 2007 NCRA had filed a notice of categorical exemption under CEQA for a *separate* project contemplating maintenance and repair activities along the line. The City of Novato sought mandamus and declaratory relief against NCRA and other agencies. The Court of Appeal and the parties agree that the City of Novato's lawsuit was directed at the categorical exemption; the record does not appear to contain the complaint. Under the parties' consent decree of November 2008, NCRA admitted the court's jurisdiction. The parties bound themselves to various mitigation measures within the City of Novato, and to follow CEQA in accomplishing the work. (The decree also referred to NCRA's ongoing preparation of an EIR under CEQA for the projected reopening of freight service — that is, the project involved in the present litigation.)

traffic, among other things. It acknowledged that "NCRA, acting as the CEQA lead agency, has *a duty pursuant to CEQA guidelines to neither approve nor carry out a project as proposed unless the significant environmental effects have been mitigated to an acceptable level, where possible*." (Italics added.) The draft EIR provided a lengthy analysis of potential environmental impacts of resuming freight service, including consideration of rehabilitation of the line, cumulative impacts, and potential mitigation measures.

After further hearings, a second draft EIR was filed in November 2009. Comments were received in 2010 and the final EIR was released in March 2011. The final EIR again summarized the project as being to resume freight service on the Russian River division of the line, noting that "[r]epairs to the line to bring the rail line into conformance with FRA . . . [s]tandards have been completed for most of the line, and it is now ready to resume service to Windsor." The project also was said to include four specific, rather limited repair and construction projects.

The final EIR rebutted comments claiming that the project actually included the northern or Eel River portion of the line — then consisting of unusable tracks. It also declared that rehabilitation activities covered by the 2007 notice of exemption were considered a separate project. Also appearing were rebuttal to concerns about the economic viability of the project, mitigation measures, and disposal of hazardous materials and waste.

An addendum to the EIR responding to additional comments was attached in May 2011. Joint regulatory authority was noted: "The NCRA plans and procedures as they relate to NWPCo. include, but are not limited to, rules and regulations of the Federal Railroad Administration, the Surface Transportation Board, federal, state and local laws, rules and regulations where applicable, the 2006 Lease by and between NCRA and NWPCo., the Operating Agreement with SMART, and Easement rights granted to and by NCRA. NWPCo. maintains certain obligations under each of these entities, and will

12

continue to maintain such obligations while operating on the line. If plans and procedures change over time, the revisions will be subject to the appropriate regulatory and environmental review. The agreement/contract between NCRA and NWPCo will reflect the revisions, as appropriate."

In June 2011, NCRA's board of directors (Board) adopted a resolution certifying the final EIR and approving the project, again defined as the resumption of limited freight rail service on the so-called Russian River division of the line, along with the four specified rehabilitation, construction, and repair activities.

According to the resolution, the final EIR disclosed that the project posed significant or potentially significant adverse environmental impacts that may be mitigated; that with certain exceptions the significant adverse environmental impacts had been eliminated or reduced to insignificance; and as to certain impacts, that additional mitigation was infeasible. Having balanced the risks and benefits, the Board determined that the benefits outweighed the unavoidable adverse environmental effects.

The Board made a finding that environmental impacts of development on the Eel River division of the line properly had been omitted from consideration because the Board had no intention of resuming service in that division. It stated: "Given that there are no financial resources available to resume services in the [Eel River division], the Board does not intend to operate [there]."

It appears that limited freight service has resumed on the southern or Russian River division of the line.

### E. Litigation

In July 2011, plaintiffs Friends of the Eel River and Californians for Alternatives to Toxics filed separate petitions for writ of mandate, naming NCRA as defendant and NWPCo as real party in interest. Friends of the Eel River sought alternative and peremptory writs of mandate directing NCRA to set aside its findings and certification of the EIR and approval of the project and directing its compliance with CEQA, as well as a

13

stay and preliminary and permanent injunctions preventing NCRA and its agents from "taking any action to implement, or further approve, or construct the Project, pending full compliance with the requirements of CEQA and the CEQA Guidelines," and restraining real party in interest from "taking any action to implement or construct the Project, pending full compliance with the requirements of CEQA and the CEQA Guidelines." Friends of the Eel River alleged two causes of action, both for violations of CEQA. These challenged the adequacy of the EIR and of the mitigation measures and alternatives that had been considered and adopted, and the adoption of findings assertedly not supported by substantial evidence. The challenge was based in part on assertedly inadequate consideration of hazardous materials and impacts on water quality and threatened species, and in part on the absence of consideration of the northern or Eel River portion of the railroad.

Californians for Alternatives to Toxics petitioned for a writ of mandate ordering NCRA to set aside certain findings, the certification of the final EIR, and approval of the project and instead "to follow California regulations and statutes, including [CEQA], in any review of and new decision for the Russian River Division Freight Rail Project." It sought to enjoin NCRA and NWPCo "from engaging in any activity pursuant to the Russian River Division Freight Rail Project until the Project complies with all applicable California regulations and statutes, including requirements of [CEQA]."

In all, Californians for Alternatives to Toxics alleged 10 causes of action for violations of CEQA. It alleged various inadequacies in the information provided in the projects descriptions and EIRs; inadequate response to public comment; failure to evaluate the environmental impact of various levels of freight service and of track repair and rehabilitation on water, soil, air, and other resources; inadequate consideration of mitigation measures and alternatives; and improper findings of "overriding considerations" not supported by substantial evidence. The petition also asserted that efforts to reopen the rail line in the Eel River division threatened serious environmental

14

harm, especially harm to water in rivers and coastal areas. An 11th cause of action incorporated the prior allegations and alleged that irreparable injury to natural resources constituted a basis for injunctive relief. The petition sought an order that NCRA set aside its certification of the final EIR and its findings and approvals, that it follow CEQA, and that NCRA and NWPCo be enjoined from "engaging in any activity pursuant to the Russian River . . . Project until the Project complies with . . . [CEQA]."

At this point NCRA concluded that further challenges should be met with the argument that any application of CEQA to the project, i.e., the resumption of freight service and the specified rehabilitation work, was preempted by the ICCTA.

The NCRA removed the matters to federal court, arguing the claims were preempted. The federal court found the dispute was not subject to so-called complete preemption, that is, plaintiffs were not attempting to litigate a federal cause of action in the guise of a state cause of action.[5] In addition, it determined that a case is not subject to removal solely on the basis of a federal defense, including the defense of preemption. Accordingly the federal court remanded the matters to state court.

In April 2013, the NCRA Board issued a resolution rescinding its resolution of June 2011, "to clarify that the NCRA did not have before it a 'project' as that term is used in [CEQA] and did not approve a project when it certified the EIR that was the

---

**5** The court explained that the term " ' "[c]omplete preemption" is a short-hand for the doctrine that in certain matters Congress so strongly intended an exclusive federal cause of action that what a plaintiff calls a state law claim is to be *recharacterized* as a federal claim.' " The court determined that the ICCTA does not provide the exclusive cause of action for plaintiffs' CEQA claims. On the contrary, the court observed, the federal act's preemption provision does not purport to displace any and all state law causes of action, quoting *Fayard v. Northeast Vehicle Services, LLC* (1st Cir. 2008) 533 F.3d 42, 47: " 'No one supposes that a railroad sued under state law for unpaid bills by a supplier of diesel fuel or ticket forms can remove the case based on complete preemption simply because the railroad is subject to the ICCTA.' "

subject of the Resolution. More specifically, NCRA rescinds any word, phrase or section of the Resolution to the extent that it purported to approve a project for the resumption of railroad operations . . . ." The Board acknowledged that the EIR process had been a valuable source of information for it and for the public, but that the EIR was not legally required as a condition of operation of the line. Rather, "[t]he ICCTA preempts CEQA's application over railroad operations on the line" and once the Board entered the lease with NWPCo in 2006, "no further discretionary actions or approvals were necessary by NCRA as a condition to NWPCo's right to operate the line"; that after the STB approved NWPCo's application for an exemption to operate the line in August 2007, "no further action or approval was required by the STB as a condition to NWPCo's right to operate the line"; that after the FRA partially lifted its emergency order in May 2011, "no further action or approval was required by the [FRA], or any other state or federal agency, as a condition to NWPCo's right to operate the line, and NWPCo had the legal right to immediately commence operations at that time."

With respect to its representations in its 2006 application for state funds, resulting in appropriation to NCRA of $31 million for track repair and restoration (see *ante*, at pp. 5-6), the rescission resolution stated that the Board mistakenly had believed it must prepare an EIR, but that in any event, the appropriated money had been exhausted on the track repair project that was the subject of the categorical exemption. It averred that "well before . . . the [FRA's] partial lifting of [its emergency order], the TCRP [traffic congestion relief program]-funded repair work had been substantially completed and all TCRP funds allocated by the CTC [California Transportation Commission] to NCRA for the repair work had been used; . . . [¶] [and] no TCRP funds were allocated to NCRA by the CTC for railroad operations on the line, nor were any TCRP funds used for actual railroad operations."

As for NCRA's operating and lease agreement with NWPCo, the Board acknowledged that "the lease agreement contains a provision that NCRA will comply

16

with CEQA 'as it may apply to this transaction' (meaning the NCRA's entry into the lease agreement), but the lease transaction was not challenged on CEQA grounds within the statutory time period, thus obviating NCRA's obligation to determine whether CEQA would have attached to the lease transaction."

The Board noted that freight rail operations had resumed in July 2011.

Once the matters returned from federal to state court, NCRA and NWPCo demurred on the ground that the challenge under CEQA was preempted by the ICCTA and was time-barred. The trial court agreed with them that the application of CEQA was preempted, but overruled the demurrer because it found NCRA judicially estopped from pursuing that defense in light of positions it had taken in litigation ending in the consent decrees.

NCRA and NWPCo thereafter filed a motion to dismiss for mootness in light of the Board's rescission of its earlier resolution. The matter proceeded to a contested hearing before a different judicial officer. That officer reconsidered the estoppel point and rejected it, albeit agreeing with the first judicial officer that the preemption defense applied. The court entered orders denying the petitions for writ of mandate.

The Court of Appeal affirmed. The court held initially that the controversy was not moot. It also concluded that the ICCTA was broadly preemptive of CEQA, and that the so-called market participant doctrine did not defeat preemption. It rejected plaintiffs' view that principles of state sovereignty require that the ICCTA be interpreted to spare from preemption the state's control over NCRA, the state's own subdivision. The Court of Appeal also held that plaintiffs lacked standing to premise their challenges on the agreement between NCRA and NWPCo. Finally, it rejected their judicial estoppel argument.

In its opinion, the Court of Appeal rejected the decision of another Court of Appeal, namely *Town of Atherton v. California High-Speed Rail Authority* (2014) 228 Cal.App.4th 314, which had addressed a route-selection element of California's high-

17

speed rail project and, principally relying on a market participant theory, had concluded that there was no ICCTA preemption of CEQA in that case.

Friends of the Eel River and Californians for Alternatives to Toxics petitioned for review, challenging the Court of Appeal's analysis and conclusion on the preemption issue. (The issues of mootness and judicial estoppel are not preserved for our review.)

## II. Discussion

### A. Introduction

The Court of Appeal found that the ICCTA preemption language is broad and concluded that "CEQA is preempted by federal law when the project to be approved involves railroad operations." Plaintiffs, by contrast, rely on presumptions governing the proper analysis of federal preemption language to contend that the ICCTA does not preempt application of CEQA in this case.

We begin with general preemption principles, including certain presumptions. Because the question before us is fundamentally one of statutory construction, we next turn to the text of the ICCTA preemption provision, the overall function of the ICCTA, and the unifying and deregulatory purpose disclosed by legislative history of the federal law. We observe that the ICCTA continues and strengthens a federal approach calling for a national as opposed to balkanized rail system. It also is apparent that the ICCTA completes a congressional trend in favor of relieving rail transportation of regulation and substituting the market as a dominant force.

We next consider the preemptive impact of the ICCTA, especially as to state environmental regulation. We briefly outline the CEQA scheme that the Court of Appeal, along with NCRA and NWPCo, contend is preempted here.

As the Court of Appeal correctly pointed out, the national system of railroads is of peculiarly federal, not state, concern. The ICCTA is both unifying and deregulatory; it would undermine both values if states could compel the rail industry to comply with regulation of railroads that conflicted with federal law, or even to comply with

18

supplementary regulation of railroads on a state-by-state basis. We acknowledge that, at least as to privately owned railroads, state environmental permitting or preclearance regulation that would have the effect of preventing a private railroad from operating pending CEQA compliance would be categorically preempted.

As we will explain, federal courts — even those that take a relatively narrow view of the preemption language of the ICCTA — as well as the STB agree in this respect. In the ordinary regulatory setting in which a state seeks to govern private economic conduct, applying CEQA to condition state permission to go forward with railroad operations would be preempted.

This conclusion, however, does not resolve the application of CEQA to NCRA. The ICCTA preempts solely regulation of rail transportation, and we will discuss whether it actually constitutes regulation when the state is the owner of the rail line and, by state law, prescribes the process by which its own subsidiary agency will make decisions concerning the resumption of rail service along a rail line. We will consider whether, when the state establishes the general law according to which the state's own subsidiaries are to use the funds and powers allocated by the state — including for railroad projects — this constitutes not regulation but instead *self-governance* on the part of the state. We will conclude that CEQA may be considered a matter of self-governance in this setting — the control exercised by the state over its own subdivision.

We acknowledge that, although a CEQA process as applied to a private railroad might also be considered to reflect self-governance — in the sense that the state is governing how its subsidiary governmental entity makes development decisions concerning developments actually carried out by other, private owners — such an application of CEQA to a private line nonetheless would be preempted. Yet we believe that the analysis is different when the state is the owner of the railroad. We will discuss United States Supreme Court authority in support of this view, primarily the presumption that in the absence of unmistakably clear language, courts assume that congressional

19

preemption provisions are not intended to upset the usual constitutional balance of state and federal powers. We also will discuss, by analogy, the so-called market participant doctrine, relying on it for its presumption that, in connection with state market activities that are not regulatory, the state ordinarily has the same freedom of action as a private entity. And we will address the apparent freedom of action accorded to owners over environmental considerations presented by track repair and increased levels of service on existing railroad lines.

Because the present project appears to fall within that area of freedom of action, applying CEQA to NCRA's decisions on the project appears not to be regulation by the state but instead self-governance by the owner. As we will explain, because we see no indication in the language of the ICCTA that Congress intended to preempt such self-governance in that field, we will conclude that application of CEQA to NCRA in the present case is not preempted.

Finally, we will discuss the application of principles developed in this opinion to NWPCo, the private lessee that operates the freight service on the railroad.

### B. Federal preemption

#### 1. General principles

"The Supremacy Clause provides that 'the Laws of the United States' (as well as treaties and the Constitution itself) 'shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.' Art. VI, cl. 2. Congress may consequently pre-empt, *i.e.*, invalidate, a state law through federal legislation. It may do so through express language in a statute. But even where . . . a statute does not refer expressly to pre-emption, Congress may implicitly pre-empt a state law, rule, or other state action." (*Oneok, Inc. v. Learjet, Inc.* (2015) 575 U.S. ___ [135 S.Ct. 1591, 1594-1595] (*Oneok*); see *Quesada v. Herb Thyme Farms, Inc.* (2015) 62 Cal.4th 298, 307-308 (*Quesada*).)

20

When express preemption is claimed, the court's "task is to 'identify the domain expressly pre-empted.' [Citation.] To do so, we focus first on the statutory language, 'which necessarily contains the best evidence of Congress' pre-emptive intent.' [Citation.]" (*Dan's City Used Cars, Inc. v. Pelkey* (2013) 569 U.S. ___ [133 S.Ct. 1769, 1778].)

Indeed, in all preemption cases, whether express or implied preemption is claimed, the fundamental question regarding the scope of preemption is one of congressional intent. (*Quesada*, *supra*, 62 Cal.4th at p. 308; *Brown v. Mortensen* (2011) 51 Cal.4th 1052, 1059-1060; see *Wyeth v. Levine* (2009) 555 U.S. 555, 565; *Lorillard Tobacco Co. v. Reilly* (2001) 533 U.S. 525, 541-542.)

Implied preemption exists under defined circumstances. First, there may be " 'field' preemption" when "Congress . . . intended 'to foreclose any state regulation in the area,' irrespective of whether state law is consistent or inconsistent with 'federal standards.' [Citation.] In such situations, Congress has forbidden the State to take action in the field that the federal statute pre-empts." (*Oneok*, *supra*, 575 U.S. ___ [135 S.Ct. at p. 1595], italics omitted.) Alternatively, there may be "conflict" or "obstacle" preemption. These are present when " 'compliance with both state and federal law is impossible,' or where 'the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' [Citation.] In either situation, federal law must prevail." (*Ibid*.; see *Quesada*, *supra*, 62 Cal.4th at p. 308.)

Implied preemption may exist even in company with an express preemption clause. (*Sprietsma v. Mercury Marine* (2002) 537 U.S. 51, 65 [in context of conflict preemption].)

### 2. Presumptions

There is a presumption that protects against undue federal incursions into the internal, sovereign concerns of the states. The United States Supreme Court expressed the rule in *Gregory v. Ashcroft* (1991) 501 U.S. 452 (*Gregory*) and *Nixon v. Missouri*

21

*Municipal League* (2004) 541 U.S. 125 (*Nixon*). That case law posits a presumption that Congress would not alter the balance between state and federal powers without doing so in unmistakably clear language. (*Nixon*, *supra*, 541 U.S. at pp. 140-141; *Gregory*, *supra*, 501 U.S. at pp. 459-461; *Sheriff v. Gillie* (2016) 578 U.S. ___ [136 S.Ct. 1594, 1602] (*Gillie*); *City of Los Angeles v. County of Kern* (2014) 59 Cal.4th 618, 631 ["Principles of federalism dictate a distinct approach to the construction of statutes impinging on state sovereignty, one designed to ensure courts do not assume an incursion where none was intended"].)

A related presumption arises in the context of the so-called market participant doctrine. Federal law ordinarily preempts only state *regulation* of a defined field. Not all state law constitutes regulation. There may be no regulation and hence no preemption in circumstances when the state is acting in the marketplace in a proprietary rather than regulatory mode. This doctrine "is not a wholly freestanding doctrine, but rather a presumption about congressional intent." (*Engine Manufacturers Ass'n v. South Coast Air Quality Management Dist.* (9th Cir. 2007) 498 F.3d 1031, 1042 (*Engine Manufacturers*).) Courts presume Congress does not intend to reach and preempt a state's proprietary arrangements in the marketplace in the absence of evidence of such an expansive congressional intent. (*Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.* (1993) 507 U.S. 218, 227, 231, 233 (*Boston Harbor*); see *American Trucking Ass'ns, Inc. v. City of Los Angeles* (2013) 569 U.S. ___ [133 S.Ct. 2096, 2102-2103] (*American Trucking*); *Engine Manufacturers*, *supra*, 498 F.3d at p. 1042.)

### C. The ICCTA

We must apply these preemption principles to the ICCTA. But first we must understand that enactment.

22

*1. The federal law.*

The ICCTA contains an express preemption provision, which provides: "The jurisdiction of the STB over — [¶] (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and [¶] (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, [¶] is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." (49 U.S.C. § 10501(b).)

To understand this preemption provision, we must gain a general understanding of the ICCTA and must understand some of its key terms. The term " 'rail carrier' means a person providing common carrier rail transportation . . . ." (49 U.S.C. § 10102(5).) The term " 'transportation' includes [¶] (A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and [¶] (B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property . . . ." (*Id.*, § 10102(9).)

As for the general outlines of the ICCTA, it requires carriers to establish reasonable rates, rules, and practices related to transportation or services (49 U.S.C. § 10702); prohibits discriminatory pricing (*id.*, § 10741); and establishes common carrier obligations requiring provision of transportation or services on reasonable request. (*Id.*, § 11101; see *Decatur County Commissioners v. Surface Transp. Bd.* (7th Cir. 2002) 308 F.3d 710, 715 (*Decatur*) ["A railroad may not refuse to provide services merely

23

because to do so would be inconvenient or unprofitable. [Citation.] The common carrier obligation, however, is not absolute"].) The act prohibits rail carriers from improper obstruction of through traffic or freight (49 U.S.C. § 10744), and prohibits state or local tax discrimination against rail property. (*Id*., § 11501.)

The ICCTA assigns administrative and regulatory duties to the STB. (49 U.S.C. §§ 1301- 1302.) The STB "has jurisdiction over transportation by rail carrier." (*Id*., § 10501(a)(1).) The STB's jurisdiction applies even to intrastate transportation so long as it is "part of the interstate rail network." (*Id*., § 10501(a)(2)(A).) A number of transactions require approval from the STB. The ICCTA provides for STB licensing of railroad construction and operations (*id*., § 10901), as well as for STB authorization to abandon a rail line or discontinue service. (*Id*., § 10903; but see *GS Roofing Products Co., Inc. v. Surface Transp. Bd.* (8th Cir. 2001) 262 F.3d 767, 773 [carriers unilaterally may temporarily discontinue service by announcing embargo]; see also *Decatur, supra*, 308 F.3d 710 [20-month embargo held reasonable].) The STB has authority to prescribe routes and certain rates (49 U.S.C. § 10705) and to adjudicate claims of unreasonable rates arising from market dominance. (*Id*., § 10707.) The act provides for STB approval of railroad mergers and consolidation (*id*., §§ 11323-11324), including leases or contracts to operate property of another rail carrier, acquisition of control of a rail carrier or nonrail carrier, and acquisition by a rail carrier of trackage rights over a line owned or operated by another. (*Ibid*.)

As relevant to the present case, a certificate from the STB is required for rail carriers to construct or operate on new or extended lines, and noncarriers require a certificate authorizing acquisition or operation of a line. (49 U.S.C. § 10901(a).) At the same time, the STB *must* grant such certificates unless the request is "inconsistent with the public convenience and necessity." (*Id*., § 10901(c).)

STB regulations also govern the application of federal environmental protection law to railroad projects. (49 C.F.R §§ 1105.1-1105.12 (2016); see especially *id*.,

24

§ 1105.6 [environmental impact statements normally are required for rail construction projects, with specified exceptions; STB environmental assessments are required for abandonment, discontinuance of passenger or freight services (with exceptions) and for acquisitions, leases, or mergers resulting in changes exceeding certain thresholds; the STB has authority to modify requirements for certain proceedings]; see also *Alaska Survival v. Surface Transp. Bd.* (9th Cir. 2013) 705 F.3d 1073, 1078 (*Alaska Survival*) [when determining whether to authorize construction of a new extension of a railroad line, the STB considers the environmental record]; 3 West's Fed. Administrative Prac. (2016) Transportation, ch. 53, Surface Transportation Board, § 5390.)  Other federal agencies, including the FRA, also participate along with the STB in environmental regulation of the rail industry, especially with regard to construction of new railroad lines.  (*Alaska Survival*, *supra*, 705 F.3d at p. 1078; see also *California High-Speed Rail Authority, Exemption* (STB, June 13, 2013, No. FD 35724) 2013 WL 3053064, p. * 22.)

### 2. *Purpose and history of the ICCTA*

The ICCTA both unifies the rail industry into a national system subject to unitary federal regulation, and also deregulates the industry.  The deregulatory and unifying purpose of the ICCTA appears in its history.  Preemption of state regulation of rail transportation has a long history that is part of a federal effort to establish uniform regulation of the rail industry across state lines.  More recent enactments (including the Staggers Rail Act of 1980 (Staggers Act) and the current enactment, the ICCTA), achieve broad *deregulation* at the federal level as well, while maintaining preemption of state remedies.

The ICCTA arose in the following context.  In the 19th century, railroad owners achieved monopolies that were oppressive to other businesses and distorted the market for freight rates and services.  (See H.R.Rep. No. 104-311, 1st Sess., p. 90 (1995); Sen.Rep. No. 104-176, 1st Sess., p. 2 (1995); Eldredge, *Who's Driving the Train? Railroad Regulation and Local Control* (2004) 75 U.Colo. L.Rev. 549, 557-558

25

(hereafter Eldredge).)  In response, Congress adopted the Interstate Commerce Act of 1887 to regulate rates and services in the rail industry (as well as the motor carrier industry) and resolve some of these distortions on a national basis.  (See H.R.Rep. No. 104-311, *supra*, p. 90; Sen.Rep. No. 104-176, *supra*, p. 2; Eldredge, *supra*, at p. 558.)  Even *without* an express preemption clause in that law, the high court concluded that state court remedies for matters regulated by this earlier federal act were preempted. (*Chicago & N. W. Tr. Co. v. Kalo Brick & Tile Co.* (1981) 450 U.S. 311, 318 (*Chicago & N. W.*) [" '[I]t would be inconsistent with [federal] policy' . . . 'if local authorities retained the power to decide' whether the carriers could do what the Act authorized them to do"]; *Texas & Pac. Ry. v. Abilene Cotton Oil Co.* (1907) 204 U.S. 426, 440-441 (*Texas & Pac.*) [inconsistency between jurisdictions would destroy the uniformity and equality in rates that the enactment was intended to achieve].)

Although the earlier act was intended to achieve nationwide uniformity, it came to be seen as also having imposed an onerous regulatory burden on the industry that Congress believed should be lifted.  (H.R.Rep. No. 104-311, *supra*, pp. 90-91.)  In an effort to improve the railroads' ability to compete economically, Congress began to relieve the industry of what it termed a "Kafkaesque regulatory regime."  (*Id.*, at p. 91.) Congress accordingly adopted the Staggers Act, the precursor to the ICCTA.  (Pub.L. No. 96-448, *supra*, 94 Stat. 1895; see H.R.Rep. No. 104-311, *supra*, p. 91; Eldredge, *supra*, 75 U.Colo. L.Rev. at p. 558.)

The Staggers Act "deregulated most railroad rates, legalized railroad shipping contracts, simplified abandonments, and stimulated an explosion of service and marketing alternatives . . . ."  (H.R.Rep. No. 104-311, *supra*, p. 91.)  An important deregulatory feature was a provision giving the regulatory agency, the ICC, the administrative power to accomplish *additional* deregulation through its exemption power. (*Ibid.*; *G. & T. Terminal Packaging Co., Inc. v. Consolidated Rail Corp.* (3d Cir. 1987) 830 F.2d 1230, 1234 (*G. & T. Packaging*) [calling the exemption authority a "principal

component" of the enactment].)  This administrative power to afford exemption from regulation was "employed aggressively," producing what was viewed as a "renaissance in the railroad industry."  (H.R.Rep. No. 104-311, *supra*, p. 91.)

With the Staggers Act, Congress not only deregulated, but also made its earlier implied preemptive purpose express.  In language that basically parallels that appearing in 49 United States Code section 10501 today, the Staggers Act provided that "[t]he jurisdiction of the [ICC] . . . over transportation by rail carriers, and the remedies provided in this title with respect to the rates, classifications, rules, and practice of such carriers, is exclusive."  (49 U.S.C. former § 10501(d), added by Pub.L. No. 96-448 (Oct. 14, 1980) 94 Stat. 1895, 1915.)  This language was intended to "assure uniform administration of the regulatory standards of the Staggers Act."  (H.R.Rep. No. 104-422, 1st Sess., p. 167 (1995).)  It was held to go beyond the question of jurisdiction, and to indicate that with respect to rail regulation, the Staggers Act remedies themselves were exclusive, displacing state remedies.  (*G. & T. Packaging*, *supra*, 830 F.2d at p. 1234; see also H.R.Rep. No. 96-1430, 2d Sess., p. 106 (1980), reprinted in 1980 U.S. Code Cong. & Admin. News 4110, 4138 ["The remedies available against rail carriers with respect to rail rates, classifications, rules and practices are exclusively those provided by the Interstate Commerce Act . . . and any other federal statutes which are not inconsistent with the . . . Act.  No state law or federal or state common law remedies are available"].)  State common law remedies with respect to matters such as reasonable rates could not be substituted to fill a gap when the ICC had decided in favor of *deregulation.*  (*G. & T. Packaging*, *supra*, 830 F.3d at p. 1235.)  The statute did provide a limited exception to the exclusive remedy provision, however, that permitted states to obtain ICC certification to enforce the federal act as to purely intrastate transportation.  (H.R.Rep. No. 104-311, *supra*, p. 83.)  There was also a disclaimer explaining that ordinary state police powers were not preempted.

The Staggers Act relieved the industry of heavy federal regulation, but Congress evidently believed *further deregulation* was called for. Congress "recogni[zed] that the surface transportation industry is competitive and that *few economic regulatory activities are required to maintain a balanced transportation network*." (H.R.Rep. No. 104-311, *supra*, p. 82, italics added.) Accordingly in 1995, Congress adopted the current regulatory scheme — the ICCTA. (49 U.S.C. § 10101 et seq.) According to a congressional report on the bill, the ICCTA "builds on the deregulatory policies that have promoted growth and stability in the surface transportation sector. *For the rail industry, only regulations are retained that are necessary to maintain a 'safety net' or 'backstop' of remedies to address problems of rates, access to facilities, and industry restructuring. . . .*" (H.R.Rep. No. 104-311, *supra*, p. 93, italics added.)

The express, statutorily defined policy of the ICCTA is "to minimize the need for Federal regulatory control over the rail transportation system" (49 U.S.C. § 10101(2)), "to reduce regulatory barriers to entry into and exit from the industry" (*id*., § 10101(7)), to promote a "sound rail transportation system with effective competition" (*id*., § 10101(4)), and to permit the market to establish reasonable rates. (*Id*., § 10101(1); see *Fayus Enterprises v. BNSF Railway* (D.C. Cir. 2010) 602 F.3d 444, 450 (*Fayus*) [commenting that alterations in the ICCTA were "entirely in a deregulatory direction"].) The power vested in the governing agency to afford additional exemptions from regulation on an administrative basis was enhanced; now the agency has a statutory *duty* to afford exemptions "to the maximum extent consistent with [the ICCTA]." (49 U.S.C. § 10502(a); see H.R.Rep. No. 104-311, *supra*, p. 96 [also noting the elimination of some former restrictions on the granting of exemptions that were viewed as unnecessary in light of the functioning of the market].) This provision is seen as streamlining the regulatory process. (*Alaska Survival*, *supra*, 705 F.3d at p. 1078.) Regulations provide for routine exemption from acquisition and operations certificate requirements (see 49

C.F.R. § 1150.31 (2016)) — which is what occurred in the present case both for NCRA and NWPCo.

Still, the ICCTA does provide for federal regulation, including "Federal regulatory oversight of line constructions, line abandonments, line sales, leases, and trackage rights, mergers and other consolidations . . . , antitrust immunity for certain collective activities . . . , competitive access, financial assistance, feeder line development, emergency service orders, and recordation of equipment liens." (Sen.Rep. No. 104-176, *supra*, p. 7.)

As for the preemption provision itself, as noted, former language stating the exclusive jurisdiction of the federal agency to provide remedies was largely retained, but the preemptive force of the statute was enhanced. Additional preemptive language was added in the ICCTA, specifically this sentence: "Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." (49 U.S.C. § 10501(b).) With this language, the limited regulatory role of the states that had been retained by the Staggers Act was eliminated. Congressional reports announced that "[t]he bill is intended to standardize all economic regulation (*and deregulation*) of rail transportation under Federal law, without the optional delegation of administrative authority to State agencies to enforce Federal standards, as provided in the relevant provisions of the Staggers Rail Act." (H.R.Rep. No. 104-311, *supra*, p. 95, italics added.) The unifying intent of the statute remains vital. (Sen.Rep. No. 104-176, *supra*, p. 6 ["The railroad system in the United States is a nationwide network. The hundreds of rail carriers that comprise the railroad industry rely on a nationally uniform system of economic regulation. Subjecting rail carriers to regulatory requirements that vary among the States would greatly undermine the industry's ability to provide the 'seamless' service that is essential to its shippers and would w[e]aken the industry's efficiency and competitive viability"].) Yet it was acknowledged that outside the regulated field, states

29

"retain the police powers reserved by the Constitution." (H.R.Rep. No. 104-311, *supra*, p. 96.)

### D. *Preemptive impact of the ICCTA on state regulation*

To review, we have seen that under 49 U.S.C. section 10501, the STB has exclusive jurisdiction over transportation by rail carrier, including the movement of goods and all services related to that movement. Its remedies are exclusive and expressly preempt state remedies "with respect to regulation of rail transportation." (*Id.*, § 10501(b).)

There is no dispute that NCRA and NWPCo are rail carriers within the meaning of the ICCTA and have received exemptions from certificate requirements, permitting eventual operation of services. Nor is there any dispute that their operation of freight service on the rail line in this case is "rail transportation" and is within the jurisdiction of the STB.

#### 1. *CEQA*

To understand whether application of CEQA to the rail carriers in this case would constitute regulation of rail transportation within the terms of the ICCTA, we must review some essential features of CEQA.

CEQA embodies a central state policy to require state and local governmental entities to perform their duties "so that major consideration is given to preventing environmental damage." (Pub. Resources Code, § 21000, subd. (g); see *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 (*Laurel Heights*).)

CEQA prescribes how governmental decisions will be made when public entities, including the state itself, are charged with approving, funding — *or themselves undertaking* — a project with significant effects on the environment. (Pub. Resources Code, § 21065, subd. (a) [defining a "project" to include "activit[ies] directly undertaken by any public agency"]; see also *id.*, §§ 21100 [state agency procedures], 21102 [state

agency generally cannot request state funds for a project which may have a significant effect on the environment without an EIR], 21104 [responsibilities of state lead agencies], 21105 [state agency EIRs], 21151 [local agencies]; *Sunset Sky Ranch Pilots Assn. v. County of Sacramento* (2009) 47 Cal.4th 902, 907; *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 119 (*Mountain Lion Foundation*); *Laurel Heights*, *supra*, 47 Cal.3d at pp. 390-391.)[6]

The Legislature, in enacting CEQA, imposed certain principles of self-government on public entities. In other words, CEQA is a legislatively imposed directive governing how state and local agencies will go about exercising the governmental discretion that is vested in them over land use decisions. (See *California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 383 [emphasizing CEQA's function in self-government]; *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 (*Citizens of Goleta Valley*) [same]; *Laurel Heights*, *supra*, 47 Cal.3d at p. 392 [same]; see also *Mountain Lion Foundation*, *supra*, 16 Cal.4th at p. 112 [CEQA applies to projects calling for the lead agency to "use its judgment in deciding whether and how to carry out the project"]; *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 566-567 [CEQA prescribes rules under which state and local agencies are to exercise quasi-judicial as well as quasi-legislative discretion].)

CEQA review is undertaken by a lead agency, defined as "the *public agency* which has the principal responsibility for *carrying out* or approving a project which may have a significant effect upon the environment." (Pub. Resources Code, § 21067, italics added.) The lead agency's function in the environmental review process is so important

---

**6**    Certain projects are exempt from CEQA, including passenger or commuter rail services (Pub. Resources Code, § 21080, subd. (b)(10)), but there is no exemption for freight rail projects.

that it cannot be delegated to another body.  (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 907.)

CEQA provides for extensive review on the part of the lead public agency. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 390.)  "The EIR has been aptly described as the 'heart of CEQA.'  [Citations.]  Its purpose is to inform the public and its responsible officials of the environmental consequences of their decision before they are made." (*Citizens of Goleta Valley*, *supra*, 52 Cal.3d at p. 564, fn. & italics omitted.)

Agencies are directed to mitigate or avoid significant environmental impacts in projects they carry out (or approve) if it is feasible to do so (Pub. Resources Code, § 21002.1, subd. (c)), retaining discretion to carry out the project notwithstanding impacts when mitigation is infeasible and certain findings have been made.  (*Id*., §§ 21002.1, subd. (c), 21081.)  The EIR must set forth not only environmental impacts and mitigation measures to be reviewed and considered by state and local agencies, but also project alternatives (*id*., §§ 21001, subd. (g) [local lead agencies], 21002.1, subd. (a), 21100, subd. (b)(4) [state lead agencies]; *Citizens of Goleta Valley*, *supra*, 52 Cal.3d at pp. 564-565) — *including a "no project" alternative*.  (Cal. Code Regs., tit. 14, § 15126.6.)  As we have said, "the mitigation and alternatives discussion forms the core of the EIR."  (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1162.)  When economic, legal, or other considerations make mitigation or avoidance infeasible, the agency must make a finding of overriding benefits that outweigh environmental effects.  (Pub. Resources Code, § 21081, subds. (a)(3), (b).)

Typically CEQA requirements must be complied with as a condition of the approval of projects or the undertaking of a project by the public agency itself.  An agency must not carry out a project when an EIR is certified identifying significant environmental impacts, without first making specific findings regarding mitigation and overriding benefits.  (Pub. Resources Code, § 21081; *City of Marina v. Board of Trustees of California State University* (2006)  39 Cal.4th 341, 350.)

CEQA is enforced with powerful remedies to ensure that the review process is completed appropriately and the various findings are made before projects go forward. Litigants, including members of the public, may apply to courts to order agencies to void, either in whole or in part "any determination, finding, or decision . . . made without compliance" with CEQA. (Pub. Resources Code, § 21168.9, subd. (a); see also Code Civ. Proc., § 1086 [standing for persons beneficially interested]; *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 166, 170 [summarizing principles of standing under CEQA].) CEQA affords enforcement mechanisms that *may* have the effect of preventing or impeding progress on a public or private project pending compliance with CEQA requirements. (Pub. Resources Code, § 21168.9, subd. (a)(2) [mandate to public agency and real party in interest to suspend any or all specific project activities until agency "has taken any actions that may be necessary to bring the determination, finding, or decision into compliance with [CEQA]"].) But orders may be limited and include "only those mandates which are necessary to achieve compliance" and "only those specific project activities in noncompliance" with CEQA. (*Id*., § 21168.9, subd. (b) [severability findings].)

Using the mechanisms we have just described, plaintiffs challenged the evidentiary basis of NCRA's findings and EIR certification, seeking an order that NCRA set aside its findings, certification, and project approval pending CEQA compliance. In addition, plaintiffs relied on CEQA to seek an injunctive remedy to halt the project as to both NCRA and NWPCo pending NCRA's further reporting, mitigation measures, and consideration of alternatives as provided by CEQA. In other words, plaintiffs sought to require NCRA, as the lead agency, to comply more fully with CEQA. They would impose state law requirements on that agency as a condition of its decision to proceed with a project defined as the resumption of freight rail service along an existing line (together with some limited track repairs).

### 2. CEQA would be preempted as applied to halting operations by a private rail line

As the Court of Appeal recognized in its opinion in this case, there is little doubt that application of CEQA to halt resumption of service by a private rail carrier pending CEQA review by a state or local agency would have the effect of regulating rail transportation and *would* be categorically preempted regulation.

As the Court of Appeal pointed out, regulation of the national system of railroads is of peculiarly federal concern, rather than one involving historic state police powers. (See *Scheiding v. General Motors Corp.* (2000) 22 Cal.4th 471, 481.) We have noted that even when the early federal law governing railroads was adopted without an express preemption clause, the high court concluded that the need for a unified federal system meant that state remedies must be superseded. (See *Texas & Pac.*, *supra*, 204 U.S. at pp. 440-441; see also *Chicago & N. W.*, *supra*, 450 U.S. at p. 318.)

The ICCTA is unifying and deregulatory; it would undermine these values if states could compel the railroad industry to halt service pending compliance with regulations that conflict with federal law or invade the regulatory field of the STB. Requiring a private rail carrier to undergo a state agency's CEQA review as a condition of operations would impose an extensive state law regulatory burden on the rail carrier as a condition of providing service. CEQA remedies could halt service on a line pending environmental compliance even though the rail carriers were licensed by the STB to undertake operations, and even though the STB may have determined that no environmental review was required. Although CEQA does not on its face specifically regulate rail transportation, its enforcement mechanisms requiring environmental compliance as a condition of project approval involving a private rail carrier would have the effect of regulating rail transportation, a result inconsistent with 49 U.S.C. section 10501.

Permitting a state to regulate private railroad operations even where STB regulation is absent or has been satisfied is also inconsistent with the broad deregulatory

34

purpose of the ICCTA. State regulation would be in tension with the fact that the ICCTA, like its predecessors, contemplates a national rail system operating with minimal regulation, not an industry subject to a patchwork of state regulation. It would undermine the purpose of the ICCTA if states could compel the rail industry to comply with *supplementary* regulation on a state-by-state basis even when the STB has left a regulatory hole, or, to put it more positively, a sphere of freedom of action for the owner. As a number of courts have indicated, given the deregulatory purpose of the ICCTA, what is deregulated under the ICCTA cannot be reregulated by the states. (See *Fayus*, *supra*, 602 F.3d at p. 450 [the ICCTA contains no "invitation to states to fill the regulatory void created by federal deregulation"]; *Florida East Coast Ry. v. City of West Palm Beach* (11th Cir. 2001) 266 F.3d 1324, 1338 (*Florida East Coast Ry.*); *Port City Properties v. Union Pacific Ry. Co.* (10th Cir. 2008) 518 F.3d 1186, 1188-1189 [the ICCTA permits entities to construct certain tracks without STB approval, but this "void" does not permit state regulation of such tracks]; *CSX Transp., Inc. v. Georgia Public Serv. Com'n* (N.D.Ga. 1996) 944 F.Supp. 1573, 1581 [rejecting claim that Georgia could regulate the closure of ticketing agencies in the absence of federal regulation or remedies on that subject]; Sen.Rep. No. 104-176, *supra*, p. 6 [nothing in the ICCTA "should be construed to authorize States to regulate railroads in areas where Federal regulation has been repealed"]; see also *Boston & Maine Corp. and Town of Ayer, MA, Petition* (STB, Apr. 30, 2001, No. FD 33971) 2001 WL 458685, p. * 4 (*Boston & Maine*), affd. *sub nom. Boston & Maine Corp. v. Town of Ayer* (D.Mass. 2002) 191 F.Supp.2d 257 [town's preconstruction permit requirement preempted although STB approval not required]; *Thomas Tubbs, Petition* (STB, Oct. 29, 2014, No. FD 35792) 2014 WL 5508153, p. * 6; *Cities of Auburn & Kent, WA, Petition* (STB, July 1, 1997, No. FD 33200) 1997 WL 362017, p. * 7 (*Auburn & Kent*), affd. *sub nom. City of Auburn v. U.S. Government* (9th Cir. 1998) 154 F.3d 1025; *North San Diego County Transit Development Board, Petition* (STB, Aug. 19, 2002, No. FD 34111) 2002 WL 1924265, p. * 5 (*North San Diego*).)

For the foregoing reasons, we acknowledge that state environmental permitting or preclearance regulation that would have the effect of halting a private railroad project pending environmental compliance would be categorically preempted. In the ordinary regulatory setting in which a state seeks to govern private economic conduct, requiring CEQA compliance as a condition of state permission to go forward with railroad operations would be preempted.

Federal courts — even those that do not regard the ICCTA's preemption clause as broad and sweeping — as well as the STB agree with the foregoing conclusion. Some decisions refer to the preemption provision as "sweeping," "pervasive" and "comprehensive." (*Auburn*, *supra*, 154 F.3d at p. 1029 (*Auburn*); see also *Union Pacific Ry. Co v. Chicago Transit Auth.* (7th Cir. 2011) 647 F.3d 675, 678 (*Union Pacific*).) Many federal decisions, on the other hand, characterize the preemption clause of the ICCTA as relatively narrow. (*Florida East Coast Ry.*, *supra*, 266 F.3d at p. 1331 [the ICCTA preempts " '*regulation* of rail transportation,' " not all laws " 'with respect to rail transportation' "]; see *Franks Investment Co. LLC v. Union Pacific Ry. Co.* (5th Cir. 2010) 593 F.3d 404, 410 (*Franks*); *PCS Phosphate Co., Inc. v. Norfolk Southern Corp.* (4th Cir. 2009) 559 F.3d 212, 218 (*PCS Phosphate*); *New York Susquehanna v. Jackson* (3d Cir. 2007) 500 F.3d 238, 252 (*Susquehanna*).)

But it is unnecessary to address disputes among federal courts concerning whether to designate the preemption provision as broad or narrow, because in fact, even those with a narrow view of preemption accept the same formulation concerning state environmental laws. In this view, the "preemption analysis distinguishes between two types of preempted state actions or regulations. First, there are those state actions that are 'categorically preempted' by the ICCTA because such actions 'would directly conflict with exclusive federal regulation of railroads.' [Citation.] Regulations falling within this first category are 'facially preempted' or 'categorically preempted' and come in two types: [¶] 'The first is any form of state or local permitting or preclearance that, by its

36

nature, could be used to *deny a railroad the ability to conduct some part of its operations* or to proceed with activities that the [STB] has authorized . . . . [¶] Second, there can be no state or local regulation of matters directly regulated by the [STB] — such as the construction, *operation*, and abandonment of rail lines [citation]; railroad mergers, line acquisitions, and other forms of consolidation [citation]; and railroad rates and service [citation].' [¶] [Citation.] State actions such as these constitute 'per se unreasonable interference with interstate commerce.' [Citation.] As such, the preemption analysis for state regulations in this first category is addressed to 'the act of regulation itself' and 'not to the reasonableness of the particular state or local action.' [Citation.] [¶] The second category of preempted state actions and regulations are those that are preempted as applied. Section 10501(b) [of 49 U.S.C.] may preempt state regulations, actions, or remedies as applied, based on the degree of interference the particular state action has on railroad operations. 'For state or local actions that are not facially preempted, the section 10501(b) preemption analysis requires a factual assessment of whether that action would have the effect of preventing or unreasonably interfering with railroad transportation.' [Citation.] . . . . [T]he STB stated that 'it is well settled that states cannot take an action that would have the effect of foreclosing or unduly restricting a railroad's ability to conduct any part of its operations or otherwise unreasonably burdening interstate commerce.' " (*New Orleans & Gulf Coast Ry. Co. v. Barrois* (5th Cir. 2008) 533 F.3d 321, 332, italics added & omitted (*New Orleans & Gulf Coast*); see also *Union Pacific*, *supra*, 647 F.3d at p. 679; *Franks*, *supra*, 593 F.3d at pp. 410, 413; *Adrian & Blissfield Ry. Co. v. Village of Blissfield* (6th Cir. 2008) 550 F.3d 533, 539-540 (*Adrian & Blissfield*); *Emerson v. Kansas Southern Ry. Co.* (10th Cir. 2007) 503 F.3d 1126, 1130, 1132-1133 (*Emerson*); see also *People v. Burlington Northern Santa Fe Railroad* (2012) 209 Cal.App.4th 1513, 1528 (*Burlington*).)

More specifically, the rule seems well accepted in federal courts that the ICCTA preempts state and local environmental regulation requiring private railroad companies to

acquire permits or preclearance *as a condition to operating the railroad*, as well as remedies that would prohibit the conduct of railroad business pending compliance with state or local environmental requirements.

For example, in *Auburn*, *supra*, 154 F.3d 1025, a private rail carrier was before the STB seeking approval to reacquire a portion of a rail line through the Stampede Pass in Washington State, and to reopen service on the route. The rail carrier's plans included repairs and improvements on the line. STB environmental staff, following environmental assessments under the federal environmental law, concluded the project would not have a significant environmental effect if certain mitigation efforts were undertaken. The STB approved the project, but the City of Auburn challenged the agency's decision, arguing that the agency erroneously had found state and local environmental review of the project and the related permitting process to be preempted by the ICCTA. The city sought to compel the private rail carrier's compliance with state and local environmental rules as a precondition to rail operations, but the court determined that such application of state and local law was preempted.

The City of Auburn argued, as do plaintiffs and amici curiae supporting them in the present case, that the ICCTA preempts *solely* economic regulation of railroads, but not a state's exercise of traditional police power to protect the environment. The Ninth Circuit responded that, on the contrary, rail regulation has long been viewed as a subject of federal concern from which states are excluded, and that prior law, as continued in effect by the ICCTA, was "recognized as 'among the most pervasive and comprehensive of federal regulatory schemes.' " (*Auburn*, *supra*, 154 F.3d at p. 1029.) The court referred to both 49 U.S.C. section 10501(b)'s statement of exclusive jurisdiction and its explicit preemption clause displacing state remedies " 'with respect to regulation of rail transportation' " (154 F.3d at p. 1030), as well as other language, commented on the absence of language in the act expressly sparing state environmental regulation from preemption (*Auburn*, *supra*, p. 1031 ["there is no evidence that Congress intended any

such state role under the ICCTA to regulate the railroads"]), and drew parallels with the preemptive scope of assertedly similar federal laws. (*Ibid.*)

In conclusion, the *Auburn* court observed, "the distinction between 'economic' and 'environmental' regulation begins to blur. For if local authorities have the ability to impose 'environmental' permitting regulations on the railroad, such power will in fact amount to 'economic regulation' if the carrier is prevented from constructing, acquiring, operating, abandoning, or discontinuing a line. [¶] We believe the congressional intent to preempt this kind of state and local regulation of rail lines is explicit in the plain language of the ICCTA and the statutory framework surrounding it. [Citation.] Because congressional intent is clear, and the preemption of rail activity is a valid exercise of congressional power under the Commerce Clause, we affirm the STB's finding of federal preemption." (*Auburn*, *supra*, 154 F.3d at p. 1031, fn. omitted; see also *Susquehanna*, *supra*, 500 F.3d at p. 252 [rejecting the view that the ICCTA preempts solely economic regulation]; *Florida East Coast Ry.*, *supra*, 266 F.3d at p. 1331 [same].)

In another decision — also involving state attempts to exert control over a private rail carrier — the court in *Green Mountain Railroad Corp. v. Vermont* (2d Cir. 2005) 404 F.3d 638 (*Green Mountain*) held that the ICCTA preempted Vermont's efforts to obtain a declaratory judgment requiring the railroad carrier to go through a state environmental law process imposing mitigation conditions before the carrier could obtain a permit to construct a transloading facility on its land. The Second Circuit relied on the ICCTA's language expressly preempting "remedies . . . with respect to regulation of rail transportation" (49 U.S.C. § 10501(b)), vesting in the STB exclusive jurisdiction over transportation by rail carriers (*ibid.*), and defining the term "transportation" broadly to include facilities related to movement of passengers or freight under section 10102(9). (*Green Mountain*, at p. 642.) The state preconstruction permit requirement in that case was preempted because it " 'unduly interfere[s] with interstate commerce by giving the local body the ability to deny the carrier the right to construct facilities or conduct

operations,' [citation]; and . . . it can be time-consuming, allowing a local body to delay construction of railroad facilities almost indefinitely." (*Id.* at p. 643.) The court also relied on *Auburn*, federal district court opinions, and STB decisions for the proposition that " 'state and local permitting or preclearance requirements (including environmental requirements) are preempted because by their nature they unduly interfere with interstate commerce.' " (*Ibid.*)

The *Green Mountain* court acknowledged, as numerous other cases have, that state and local governments retain some "traditional police powers over the development of railroad property," suggesting that such police powers should be recognized solely "to the extent that the regulations protect public health and safety" and are defined, settled, and can be obeyed with certainty and without delay or exercise of discretion. (*Green Mountain*, *supra*, 404 F.3d at p. 643.) "Electrical, plumbing and fire codes, direct environmental regulations enacted for the protection of the public health and safety, and other generally applicable, non-discriminatory regulations and permit requirements would seem to withstand preemption." (*Ibid.*; see also *Susquehanna*, *supra*, 500 F.3d at pp. 253-254; see generally cases discussed *post*, pt. II.E.1.) But the *Green Mountain* court found no need to identify the dividing line between permissible and impermissible state or local regulation, on the ground that preemption was clearly called for in the case before it. The environmental permitting law gave the local agency the ability to inordinately delay or deny the rail carrier the right to build. Preemption was required because "the railroad is restrained from development until a permit is issued" and issuance of the permit depends on an exercise of state or local agency discretion. (*Green Mountain*, *supra*, 404 F.3d at p. 643.)

STB decisions are to the same effect, including decisions involving CEQA. In one case, for example, the STB entered a declaratory order finding that a private rail carrier's proposed construction of a high-speed rail line between California and Nevada would come within federal environmental provisions, but that "state permitting and land use

40

requirements that would apply to non-rail projects, such as the California Environmental Quality Act, will be preempted. [Citation.] But state and local agencies and concerned citizens will have ample opportunity to participate in the ongoing [environmental impact statement] process under [federal environmental] and related laws." (*DesertXpress Enterprises*, *LLC*, *Petition* (STB, June 25, 2007, No. FD 34914) 2007 WL 1833521, p. * 3.) And the STB has reached similar decisions with respect to the laws of other states. (See *CSX Transportation, Inc., Petition* (STB, May 3, 2005, No. FD 34662) 2005 WL 1024490, pp. * 3, * 4 [D.C. law governing transportation of hazardous materials near the United States Capitol Building was preempted; it would require railroads to obtain a permit to move rail traffic and would be "directly covered by the categorical preemption against state and local permitting processes" and any ban on certain cargo "would directly conflict with the [STB's] regulatory authority over rail operations"]; *Boston & Maine*, *supra*, 2001 WL 458685, p. * 5 [town's preconstruction permit requirement preempted].)

In conclusion, there seems little doubt that, in the ordinary regulatory setting in which a state seeks to regulate a private rail carrier, applying CEQA to condition permission for that carrier to go forward with railroad operations would be preempted by the ICCTA.

### E. The Court of Appeal's conclusion nonetheless is overbroad and incorrect

The Court of Appeal declined to invoke any presumptions concerning the scope of ICCTA preemption, and, as noted, declared that "CEQA is preempted by federal law when the project to be approved involves railroad operations." The court's conclusion exceeds the proper scope of the ICCTA and violates the preemption principles we have discussed.

#### 1. Police powers

Preliminarily, we note that the quoted language is too broad in that the federal interest in rail transportation does not entirely sweep away the exercise of the state's

41

regulatory police powers when such regulation merely implicates rail transportation. Even as to powers that are exclusively federal, "it does not follow that any and all state regulations *touching on* [that power] are preempted." (*In re Jose C.* (2009) 45 Cal.4th 534, 550, italics added [upholding state law connected to immigration matters].)  The federal decisions we have discussed differentiate state laws that are categorically preempted by the ICCTA, such as environmental preclearance requirements for railroad operations, from those that merely *burden* rail transportation and may be preempted as applied if, under the particular facts, they would interfere unduly with railroad operations or unreasonably burden interstate commerce.  (*New Orleans & Gulf Coast*, *supra*, 533 F.3d at p. 332; see also *Franks*, *supra*, 593 F.3d at pp. 410, 413; *Adrian & Blissfield*, *supra*, 550 F.3d at pp. 539-540; *Emerson*, *supra*, 503 F.3d at pp. 1130, 1132-1133; *Burlington*, *supra*, 209 Cal.App.4th at p. 1528.)  The case law supports the conclusion that the ICCTA does not broadly preempt *all* historic state police powers over health and safety or land use matters, to the extent state and local regulation and remedies with respect to these issues do not discriminate against rail transportation, do not purport to govern rail transportation directly, and do not prove unreasonably burdensome to rail transportation.  (*Emerson*, *supra*, 503 F.3d at pp. 1130, 1132-1133 [state tort claims for improper disposal of railroad ties not preempted]; see also *Franks*, *supra*, 593 F.3d at p. 410 [the ICCTA does not preempt state law with a remote or incidental effect on rail transportation; state action enjoining railroad from removing privately owned railroad crossings not preempted]; *PCS Phosphate*, *supra*, 559 F.3d at pp. 218-220 [ICCTA preemption does not displace ordinary voluntary agreements between private parties]; *Adrian & Blissfield*, *supra*, 550 F.3d at pp. 540-541 [state track maintenance statute that would require the railroad to pay for pedestrian crossings across its tracks was not preempted; imposing increased costs on railroad is not by itself enough to establish unreasonable interference]; *Susquehanna*, *supra*, 500 F.3d at pp. 252-255 [fines may be imposed under state law on railroad for environmental hazards at transloading facility;

the ICCTA would not preempt, for example, rules fining the railroad for dumping debris or harmful substances]; *Green Mountain*, *supra*, 404 F.3d at p. 643; *Florida East Coast Ry.*, *supra*, 266 F.3d at pp. 1328, 1331 [ICCTA preemption does not extend to traditional police power of zoning and health and safety regulation]; *Jones v. Union Pacific Railroad Co.* (2000) 79 Cal.App.4th 1053, 1060 [state nuisance action based on train noise and fumes not necessarily preempted if the plaintiffs can demonstrate the challenged nuisance did not further the railroad's operations]; *In re Vermont Ry.* (Vt. 2000) 769 A.2d 648, 655 [zoning conditions imposed not on rail line but on truck traffic and environmental conditions at railroad's salt shed not preempted]; *City of Girard v. Youngstown Belt Ry. Co.* (Ohio 2012) 979 N.E.2d 1273, 1283 [eminent domain action not categorically preempted]; *Home of Economy v. Burlington Northern Santa Fe Ry.* (N.D. 2005) 694 N.W.2d 840, 845-846 [state injunctive relief requiring reopening of grade crossing not preempted].) This conclusion is confirmed in the legislative history. (See H.R.Rep. No 104-311, *supra*, p. 96 [while the ICCTA is intended to preempt state economic regulation, in other respects "States retain the police powers reserved by the Constitution"].)

The STB itself has confirmed that the exercise of historic state police powers concerning environmental matters is not necessarily preempted by the ICCTA. (*Auburn & Kent*, *supra*, 1997 WL 362017, p. * 6] ["even in cases where we approve a construction or abandonment project, a local law prohibiting the railroad from dumping excavated earth into local waterways would appear to be a reasonable exercise of local police power. Similarly . . . a state or local government could issue citations or seek damages if harmful substances were discharged during a railroad construction or upgrading project. A railroad that violated a local ordinance involving the dumping of waste could be fined or penalized for dumping by the state or local entity. The railroad also could be required to bear the cost of disposing of the waste from the construction in a way that did not harm the health or well being of the local community"].)

43

The STB has recognized, too, that a state law simply requiring, for example, the development of information concerning a railroad project would not *necessarily* be preempted. In *Boston & Maine*, for example, the STB stated, "While a locality cannot require permits prior to construction, . . . a railroad can be required to notify the local government 'when it is undertaking an activity for which another entity would require a permit' and to furnish its site plan to the local government" (*Boston & Maine*, *supra*, 2001 WL 458685, p. * 5), adding that "[l]ike any citizen or business, railroads have some responsibility to work with communities to seek ways to address local concerns in a way that makes sense and protects the public health and safety" with pragmatic solutions. (*Id*., p. * 7.) "Examples of solutions that appear . . . reasonable include conditions requiring railroads to (1) share their plans with the community, when they are undertaking an activity for which another entity would require a permit, (2) use state or local best management practices when they construct railroad facilities; (3) implement appropriate precautionary measures . . . ; (4) provide representatives to meet periodically with citizen groups or local government entities to seek mutually acceptable ways to address local concerns; and (5) submit environmental monitoring or testing information to local government entities for an appropriate period of time after operations begin." (*Ibid*., fns. omitted.)

Moreover, there are various instances in which rail operations may also be subject to regulation under other federal laws that *preserve* state power to a defined degree. (See *Burlington*, *supra*, 209 Cal.App.4th at pp. 1523-1524, and cases cited [discussing the extent to which the federal rail safety law may preserve state rail safety provisions notwithstanding the ICCTA].) In their amici curiae brief, the California Environmental Protection Agency and the California Natural Resources Agency appropriately counsel caution and would avoid the Court of Appeal's broad formulation quoted above. In their view, such a statement of the law could undermine viable state environmental regulations, including those that implement those federal laws that must be harmonized

44

with the ICCTA.  They cite authority declaring that " 'nothing in [49 U.S.C.] section 10501(b) is intended to interfere with the role of state and local agencies in implementing Federal environmental statutes,' " including the Clean Air Act (42 U.S.C. § 7401 et seq.; see especially § 7401(a)(3)); the Clean Water Act (33 U.S.C. § 1251 et seq.; see especially §§ 1370, 2718); and the Safe Drinking Water Act (42 U.S.C. § 300f et seq.). (See *Ass'n of American Railroads v. South Coast Air Quality Management Dist.* (9th Cir. 2010) 622 F.3d 1094, 1097-1098 [harmonizing the ICCTA with other federal statutes and those state laws that are preserved thereunder]; see also *U.S. v. St. Mary's Ry. West, LLC* (S.D.Ga. 2013) 989 F.Supp.2d 1357, 1360-1363; *Boston & Maine*, *supra*, 2001 WL 458685, p. * 5.)  We do not, however, employ or endorse the Court of Appeal's unduly broad formulation, and our opinion should not be read to suggest that the ICCTA preemption clause is so sweeping as to displace state powers preserved under other federal provisions.

### 2. Self-government

But what is far more significant to the present case, we recall that the ICCTA preempts solely "regulation" of rail transportation.  (49 U.S.C. § 10501(b).)  We now consider whether a state engages in regulation within the meaning of the ICCTA's preemption language as applied to state law directing a subdivision of the state to develop the state's *own* freight rail transportation project according to certain environmental guidelines.

CEQA embodies a state policy adopted by the Legislature to govern how the state itself and the state's own subdivisions will exercise their responsibilities.  (See *ante*, pt. II.D.1)  When CEQA conditions the issuance of a permit for private development on CEQA compliance, and thereby restricts the ability of private citizens and companies to develop their property, this seems plainly regulatory.  But CEQA also operates as a form of self-government when the state or a subdivision of the state is itself the owner of the property and proposes to develop it.  Application of CEQA to the public entity charged

45

with developing state property is not classic *regulatory* behavior, especially when there is no encroachment on the regulatory domain of the STB or inconsistency with the ICCTA, as explained in the next section. Rather, application of CEQA in this context constitutes self-governance on the part of a sovereign state and at the same time on the part of an owner. It appears to us extremely unlikely that Congress, in enacting the ICCTA, intended to preempt a state's adoption and use of the tools of self-governance in this situation, or to leave the state, as owner, without any means of establishing the basic principles under which it will undertake significant capital expenditures.

### a. Principles derived from deregulation

We have seen from the summary of the ICCTA (see *ante*, pt. II.C), that the law provides for limited federal regulation in defined spheres. We have also seen that the ICCTA was intended to complete a deregulatory trend. Statutorily defined policy minimizes regulatory control and barriers (49 U.S.C. § 10101(2), (7)), and imposes a duty on the STB to afford regulatory exemptions "to the maximum extent consistent with [the ICCTA]." (*Id*., § 10502(a); see also 49 C.F.R. § 1150.31.)

Deregulation means that once general ICCTA compliance obligations are met, the railroad owner has a protected domain that is subject neither to federal nor to state regulation, a freedom to plan, develop, and restore rail service on market principles but within the framework of modest federal regulation. The text and history of the enactment indicate that, in the domain that has been deregulated, the owner may carry out its activities according to its own corporate goals and in response to market forces. This freedom, of course, is subject to the proviso that the owner's actions cannot *conflict* with federal regulations. But within the zone of the owner's control, the owner has considerable freedom. Freedom does not imply anarchy — the private owner ordinarily will have internal corporate rules, policies and bylaws to guide its market-based decisions. In other words, we may presume that a private conglomerate that owns a subsidiary that is a railroad company is not required to decide when it is prudent to go

46

forward with the development of a railroad project by, for example, tossing a coin. Rather, it can make its decisions based on its own internal guidelines, so long as there is no conflict with federal law.

But how is the freedom accorded to the private owner by the ICCTA to be given effect when the state is the owner of a rail line?  The ICCTA's deregulatory sweep must protect the zone of autonomy belonging to the state when it is the owner, such that within the deregulated zone, the state as owner may make its decisions based on its own guidelines rather than some anarchic absence of rules of decision.  And we have already established that CEQA is an internal guideline governing the processes by which state agencies may develop or approve projects that may affect the environment.  (See *ante*, pt. II.D.1.)

If a private owner has the freedom to adopt guidelines to make decisions in a deregulated field, we see no indication the ICCTA preemption clause was intended to deny the same freedom to the state as owner.  The ICCTA does not appear to us to be intended to effect a blanket preemption of state law governing how a state's own subdivision — its subsidiary — will enter and engage in the railroad business, so long as there is no inconsistency with regulation provided for by the ICCTA.

In fact, even putting aside broader owner decisions concerning entry into a railroad market, it appears that the specific project under consideration in the present case *was* within an owner's sphere of control.  We can discern that the track repair element of the project in the present case was within the owner's sphere under the ICCTA because the STB has chosen not to regulate track repair and renovation on existing lines.  (See *Lee's Summit*, *MO v. Surface Transp. Bd.* (D.C. Cir. 2000) 231 F.3d 39, 42-43, fn. 3 (*Lee's Summit*); *Detroit/Wayne County Port Authority v. I.C.C.* (D.C. Cir. 1995) 59 F.3d 1314, 1317 [same, under ICC]; *Flynn v. Burlington Northern Santa Fe Corp.* (E.D.Wn. 2000) 98 F.Supp.2d 1186, 1190 [although the STB has jurisdiction over rail construction, it appears it does not in fact regulate refurbishing of existing lines].)  And we can discern

47

that decisions about resuming a certain level of service, and particularly about undertaking environmental review of the impact of resumption of freight service along the line are within the owner's sphere of independent action, because the STB determined that the level of service along the line in the present case did not cross a threshold that would require federal environmental review. (See *ante*, at pp. 9-10; see also *Lee's Summit*, *supra*, 231 F.3d 39 [approving STB determination that no environmental assessment is required under the ICCTA for restored level of service, under a certain threshold, over existing but unused railroad]; *Boston & Maine*, *supra*, 2001 WL 458685, p. * 4 [railroads do not need STB approval to upgrade or increase traffic on an existing line]; see also 3 West's Fed. Administrative Prac., *supra*, § 5390, fns. 1 & 13.)

In the present case, the STB accepted NCRA's and NWPCo's petitions for exemption from STB certification requirements, but the STB's recognition of each entity's status as a rail carrier did not instruct them how soon they had to complete track repairs on the shuttered line, what the best method of repair might be, or when, specifically, they must resume service. Nothing in the exemptions tells NCRA or NWPCo *how to evaluate* choices about services or *how to decide* what methods to employ for track rehabilitation. These were owner decisions in a deregulated sphere.

 *b. The* Gregory-Nixon *rule*

 We are all the more confident of our interpretation of the ICCTA preemption provision when we return to the presumptions we discussed earlier in introducing preemption principles. (See *ante*, pt. II.B.2.) We presume that Congress, in adopting a preemption provision, does not intend to deprive a state of its sovereign authority over its internal governance — at least not without a particularly clear statement of intent. (*Raygor v. Regents of Univ. of Minn.* (2002) 534 U.S. 533, 543 ["When 'Congress intends to alter the "usual constitutional balance between the States and the Federal Government," it must make its intention to do so "unmistakably clear in the language of the statute" ' "].) This principle cautions against an interpretation of a preemption clause

48

that encroaches on states' internal authority over the structure of their governments. (See *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 388; see also *Printz v. United States* (1997) 521 U.S. 898, 928 ["It is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority"].)

We agree with plaintiffs that application of CEQA to NCRA's decisions in the deregulated sphere in this case simply constitutes the state's governance of its own subdivision, a matter of self-management that the ICCTA presumptively was not intended to entirely preempt. We rely on the high court's decisions in *Gregory*, *supra*, 501 U.S. 452, and *Nixon*, *supra*, 541 U.S. 125, in support. Those decisions hold that an interpretation of a federal statute that would infringe on state sovereignty should not be adopted absent unmistakably clear language of intent to achieve that result — language we believe is missing from the ICCTA's preemption clause.

In *Gregory*, *supra*, 501 U.S. 452, state judges challenged a state constitutional provision prescribing a mandatory retirement age, claiming that application of the provision to them would violate a federal statute barring age discrimination in employment. The high court disagreed, relying upon certain exclusionary language in the federal enactment to avoid a conclusion that would constitute an undue incursion on "the usual constitutional balance of federal and state powers." (*Id.* at p. 460.)

The Supreme Court acknowledged that in the balance between state and federal sovereign powers, the supremacy clause leaves the federal government with a "decided advantage." (*Gregory*, *supra*, 501 U.S. at p. 460.) "As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States. Congress may legislate in areas traditionally regulated by the States. This is an extraordinary power in a federalist system. *It is a power that we must assume Congress does not exercise lightly.*" (*Ibid.*, italics added.)

49

In the *Gregory* situation, the high court said, the state constitutional provision setting qualifications for judges was more than simply a matter traditionally regulated by states. Rather, it was "a decision of the most fundamental sort for a sovereign entity." (*Gregory*, *supra*, 501 U.S. at p. 460.) "Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign." (*Ibid*.) Congressional interference in this sphere "would upset the usual constitutional balance of federal and state powers. For this reason, 'it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' this balance. [Citation.] We explained recently: '[I]f Congress intends to alter the "usual constitutional balance between the States and the Federal Government," it must make its intention to do so "*unmistakably clear in the language of the statute*." [Citations.]' " (*Id.* at pp. 460-461, italics added.)

In *Gregory*, the high court explained that the requirement that courts avoid an interpretation of federal statute that would encroach on state sovereign powers was not a retreat from the rationale of *Garcia v. San Antonio Metro. Transit Auth.* (1985) 469 U.S. 528 (*Garcia*), a decision that relied primarily on the political process to protect state sovereignty from congressional commerce clause power in the context of the 10th Amendment. (*Gregory*, *supra*, 501 U.S. at p. 464.) Instead, the *Gregory* opinion said, the rule of interpretation the court was adopting — the "unmistakably clear" requirement — actually was consistent with *Garcia*. "Indeed, inasmuch as this Court in *Garcia* has left primarily to the political process the protection of the States against intrusive exercises of Congress' Commerce Clause powers, we must be absolutely certain that Congress intended such an exercise. '[T]o give the state-displacing weight of federal law to mere *ambiguity* would evade the very procedure for lawmaking on which *Garcia* relied to protect states' interests.' [Citation.]" (*Ibid*.)

In the second leading case on this point, *Nixon*, *supra,* 541 U.S. 125, the high court applied *Gregory* and concluded that a federal telecommunications enactment did

50

not preempt a state law that barred municipalities from entry into the telecommunications business. The federal act provided that "[n]o State or local statute or regulation . . . may prohibit or have the effect of prohibiting the ability of *any entity* to provide any interstate or intrastate telecommunications service." (47 U.S.C. § 253(a), italics added.) Certain municipalities claimed they fell within the designation "any entity" and that the federal law preempted the state law barring municipalities from entering the telecommunications business. The United States Supreme Court found the federal statute's reference to "any entity" ambiguous, however, and certainly not "unmistakably clear" enough to encompass *public* entities. To better understand congressional intent, the court considered how the statute would work in practice if applied to prevent the state from barring municipalities from entering the telecommunications market. "We think that the strange and indeterminate results of using federal preemption to free public entities from state or local limitations is the key to understanding that Congress used 'any entity' with a limited reference to any private entity when it cast the preemption net." (*Nixon*, *supra*, 541 U.S. at p. 133.)

The Supreme Court explained that regulatory preemption usually works by "preempting state regulation in some precinct of economic conduct carried on by a private person or corporation," thereby "simply leav[ing] the private party free to do anything it chooses consistent with the prevailing federal law. . . . On the subject covered, state law just drops out." (*Nixon*, *supra*, 541 U.S. at p. 133.) Under normal preemption of state regulation of economic activity, to give an example, if state regulation of cigarette advertising is preempted "a cigarette seller is left free from advertising restrictions imposed by a State, which is left without the power to control on that matter." (*Ibid.*)

According to the high court, preemption of a state law banning municipalities from entering the telecommunications business would yield no such simple result. The municipalities had argued in favor of preempting the state's ban on their entry into the

market, but even if the ban were preempted, the Supreme Court said, the local entities would still need a state law authorizing them to enter the market in the first place. (*Nixon*, *supra*, 541 U.S. at pp. 134-135.) And preemption would still leave the local entities at the mercy of the state over the crucial matter of funding. (*Id*. at pp. 134, 136.) Unlike with economic regulation of private actors, governmental self-regulation is an expression of governmental authority and operates so differently that the high court thought it unlikely Congress intended preemption to reach so far. (*Id*. at p. 134.)

The Supreme Court gave several examples of the unfortunate results of the municipalities' position — unlikely to have been intended by Congress — including the memorable "one-way ratchet." In the hypothetical, a state has at one time authorized municipalities to provide water, electricity and telecommunications services. Later the state statute is amended so that only water services are authorized. If the law removing authority to provide telecommunications services were preempted, "[t]he result . . . would be the federal creation of a one-way ratchet. A State or municipality could give the power, but it could not take it away later. Private counterparts could come and go from the market at will . . . ; [but] governmental providers could never leave . . . , for the law expressing the government's decision to get out would be preempted." (*Nixon*, *supra*, 541 U.S. at p. 137.)

Thus, according to the Supreme Court, the federal provision "would not work like a normal preemptive statute if it applied to a governmental unit. It would often accomplish nothing, it would treat States differently depending on the formal structures of their laws authorizing municipalities to function, and it would hold out no promise of a national consistency. We think it farfetched that Congress meant [the provision] to start down such a road in the absence of any clearer signal . . . ." (*Nixon*, *supra*, 541 U.S. at p. 138.)

The presumption described in *Nixon* and *Gregory* supports the view that CEQA is not preempted in this case. In fact, the *Nixon* decision is peculiarly apt here. The court

concluded that preemption, if recognized in such a situation, would work "by interposing federal authority between a State and its municipal subdivisions, which our precedents teach, 'are created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them in its absolute discretion.' [Citations.] Hence the need to invoke our working assumption that *federal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power, in the absence of the plain statement* Gregory *requires.*" (*Nixon*, *supra*, 541 U.S. at p. 140, italics added; see also *Gillie*, *supra*, ___ U.S. ___, ___ [136 S.Ct. at p. 1602] [warning against "constru[ing] federal law in a manner that interferes with 'States' arrangements for conducting their own governments' "].)

We may presume that the term "regulation of rail transportation" found in the ICCTA preemption provision was not intended to *entirely* sweep away a state's ability to engage in self-government over its own subsidiaries — specifically, subsidiary entities that are charged by the state with developing or reestablishing a rail line. Just as in *Nixon*, the preemption claimed by NCRA here would not work like normal preemption of a state's economic regulation in the private marketplace, but rather would intrude on state sovereignty. Preempting regulation of economic activity by a private person would, as the *Nixon* court said, "simply leave[] the private party free to do anything it chooses consistent with the prevailing federal law." (*Nixon*, *supra*, 541 U.S. at p. 133.) In other words, the private party could freely engage in self-governance as long as there was no violation of federal law. But the impact of preemption on the state as owner of a rail line would be quite different — it would leave the state without the ability to achieve self-governance through the medium normally and constitutionally available to states — the adoption of state law of general application. Without plainer language to that effect, we do not believe Congress intended to displace the exercise of a state's ordinary power of

53

self-governance when the state does not propose to act in contravention of the dictates of the ICCTA.

Crucially, what is at stake here is the state trying to govern *itself — to engage in* "decision[s] of the most fundamental sort for a sovereign entity." (*Gregory*, *supra*, 501 U.S. at p. 460.) Unlike with economic regulation of private actors, "when a government regulates itself (or the subdivision through which it acts) there is no clear distinction between the regulator and the entity regulated. *Legal limits on what may be done by the government itself (including its subdivisions) will often be indistinguishable from choices that express what the government wishes to do with the authority and resources it can command. That is why preempting state or local governmental self-regulation (or regulation of political inferiors) would work so differently from preempting regulation of private players that we think it highly unlikely that Congress intended to set off on such uncertain adventures*." (*Nixon*, *supra*, 541 U.S. at p. 134, italics added.)

As in *Nixon*, preempting the state's ability to dictate how its own subdivisions will handle environmental concerns caused by the state's own railroad business would operate so entirely differently from the usual regulatory scenario involving the private marketplace that we do not believe this was what Congress intended. Preempting the state's ability, through its laws, to adopt general precepts governing its own development schemes in the sphere in which private owners would have freedom of action would leave the state, as owner, without the tools necessary to govern its own subdivision. Such preemption could deprive the state of the ability to make decisions that would carry out the goals the state embraced concerning development projects, including undertaking environmental mitigation or deciding not to undertake a project at all because of its environmental hazards. State law, specifically CEQA, would not be regulating as applied to NCRA in any commonly understood interpretation of the term, but rather would be an expression of state governmental decisions about the disposition of state authority and resources. (See *Nixon*, *supra*, 541 U.S. at p. 134.) We see no unmistakably clear

54

indication in the language of 49 U.S.C. section 10501(b) that would direct us to the surprising conclusion that a state must operate without its usual tools and guidelines when it becomes an owner-participant in the railroad industry.

Preemption of CEQA as applied to NCRA also would mean that the state can start a railroad and fund it, but cannot control how the work is done on the line even as to matters a private owner could control. Indeed, if state law of general application does not apply to NCRA's decisions concerning the state's railroad project it is difficult to know under what rules NCRA *should* make its decisions. NCRA is not an independent corporation or a private company, but an arm of the state, created and funded by the state to carry out goals established by the Legislature. What rule of decision — with respect to matters not directly regulated by the STB — other than whim would guide NCRA's decisions, if not state law? The state would be committed to some version of the one-way ratchet — able to enter the rail business, but unable to require anything of the subordinate agency it set up to carry out the state's rail initiative. We presume Congress did not intend such an absurd result or one so intrusive on state powers of self-governance in its own forays into the market in the absence of unmistakably clear language.

The availability of citizen enforcement mechanisms does not change our view that CEQA operates as a system of self-governance as applied to NCRA in this case. What is at stake here is whether the application of state law is regulatory within the meaning of 49 U.S.C. section 10501(b). CEQA actions in this case do not become regulatory simply because they are brought by citizens.

When it created NCRA, the Legislature did not afford it a CEQA exemption, thereby committing NCRA to follow CEQA. CEQA's substantive provisions and citizen-suit provisions are intertwined. CEQA requires government entities to gather the information the entities need to make decisions about pursuing their own development projects; CEQA requires that entities engaged in considering a project with

55

environmental impacts make findings that are supported by substantial evidence; and CEQA requires that entities avoid abuses of discretion when weighing mitigation, considering project alternatives and feasibility, and in approving projects. The state, with these rules about the process of decisionmaking for its subdivisions, engages in self-government. And the Legislature has seen fit to permit these rules of self-governance to be enforced by citizen suits. Thus citizen actions are a method of enforcement chosen by the state itself, again as a matter of self-governance.

It seems evident that the state's interest in self-governance extends to designing a system of enforcement. It is not unusual for the state to authorize citizen enforcement of state-adopted rules governing how the state and its subdivisions will conduct the public's business. Indeed, citizen actions may be authorized precisely because there may be particular procedures with which a subordinate public agency is reluctant to comply. (See Gov. Code, § 11130 [action to enforce state-entity open meeting law]; *id*., § 54960, subd. (a) [action to enforce local-entity open meeting law]; see also Code Civ. Proc., § 1094.5 [administrative mandamus].)

We acknowledge that CEQA actions might cross the line into preempted regulation if the review process imposes unreasonable burdens outside the particular market in which the state is the owner and developer of a railroad enterprise. But in the context of addressing the competing federal and state interests in governing state-owned rail lines that are before us in this case, such a line is not crossed by recognizing CEQA causes of action brought against NCRA to enforce environmental rules of decision that the state has imposed on itself for its own development projects.

We by no means posit that the ICCTA does not *govern* state-owned rail lines. It appears undisputed that state-owned rail lines, like private ones, must comply with the ICCTA's provisions and with STB regulation and that state *regulation* of rail carriers is

56

preempted even when the state owns the line.[7]  But it does not appear unmistakably clear that in adopting the preemption provision of the ICCTA, Congress intended that state

---

**7**      A ruling that the ICCTA is inapplicable to state-owned railroads would be inconsistent with the plain purpose of the ICCTA and its predecessors to ensure a uniform national system of rail service subject to national — but limited — federal regulation.  We have seen that the ICCTA goes beyond its predecessor in this respect, even preempting former limited state regulation of purely intrastate lines.  Indeed it would be impossible to have a unified national rail system if a state could march to a different drummer when it owned the railroad.  In view of the national system contemplated by the ICCTA, it would be absurd to suppose that a state could require a state-owned rail line that connects with interstate tracks to, for example, abandon essential connecting lines without respect to STB requirements, shrug off its common carrier obligations without STB approval, charge discriminatory rates notwithstanding ICCTA rate restrictions, or engage in a sale that would be disapproved by the STB.

There is authority demonstrating as much.  State-owned rail lines and entities have been held subject to the common carrier obligations of the predecessor statute, the Interstate Commerce Act.  (City of New Orleans v. Texas & Pac. Ry. Co. (5th Cir. 1952) 195 F.2d 887, 889 ["So long as it engages in interstate and foreign commerce [the publicly owned line] is subject to the federal law and the Interstate Commerce Commission, like any other railroad"]; *City of New Orleans Public Belt Ry. Comm. v. Southern Scrap Material Co.* (E.D.La. 1980) 491 F.Supp. 46, 48; see also *International Long. Ass'n, AFL-CIO v. North Carolina Ports Auth.* (4th Cir. 1972) 463 F.2d 1, 3-4.)

More generally (albeit in the context of a claim under the Federal Employers' Liability Act), the high court has said it would not "throw into doubt" prior decisions "holding that the *entire* federal scheme of railroad regulation applies to state-owned railroads."  (*Hilton v. South Carolina Public Railways Comm'n* (1991) 502 U.S. 197, 203, italics added; see also *Transportation Union v. Long Island R. Co.* (1982) 455 U.S. 678, 685, 687-689 [applying *National League of Cities v. Usery* (1976) 426 U.S. 833 (which later was overruled in *Garcia, supra*, 469 U.S. 528), and concluding that because state operation of railroads is not an integral part of traditional state activities, there was no 10th Amend. violation in applying federal railroad labor law to a state-owned railroad]; *California v. Taylor* (1957) 353 U.S. 553, 567 [federal Railway Labor Act was intended "to apply to any common carrier by railroad engaged in interstate transportation, whether or not owned or operated by a State"]; *Int. Com. Comm. v. Detroit & Railway Co.* (1897) 167 U.S. 633, 642 [state railroad is a common carrier subject to the Interstate Commerce Act and its prohibition on discriminatory rates].)

The STB certainly asserts and exercises jurisdiction over state and municipally owned rail lines — as it has done in this case.  The STB has asserted that authority in a case involving another public project in California.  (See *California High-Speed Rail*

*(Footnote continued on next page)*

self-governance extending over how its own subdivisions would enter a business and make decisions a private owner could decide how to make for itself would be considered preempted regulation of rail transportation within the meaning of the preemption clause.

The Court of Appeal rejected the *Nixon* analysis on the ground that whereas in *Nixon* there was ambiguity in the statutory phrase "any entity" (*Nixon*, *supra*, 541 U.S. at p. 133), leaving room for the presumption that Congress would not interfere with state sovereignty to the extent of displacing state authority over municipalities unless it made its purpose unmistakably clear, in the case of the ICCTA, there is no ambiguity. According to the Court of Appeal, the ICCTA preempts all laws that have the effect of managing or governing rail transportation, a definition the court believed encompassed CEQA. The Court of Appeal maintained that Congress has authority under the commerce clause to regulate rail transportation, and that "[i]f Congress has the authority under the [c]ommerce [c]lause to act, that action does not invade 'the province of state sovereignty preserved by the Tenth Amendment. [Citations.] The ICCTA's preemption of CEQA as a preclearance requirement to railroad operations does not violate the Tenth Amendment."

---

*(Footnote continued from previous page)*

*Authority, Petition* (STB, Dec. 12, 2014, No. FD 35861) 2014 WL 7149612, p. * 11.) Prior authority is in accord. (*North San Diego*, *supra*, 2002 WL 1924265, pp. * 5, * 6 [public-agency-owned rail carrier could not be required to obtain a coastal development permit under the California Coastal Act or to prepare an environmental report prior to construction of a passing track]; see also *Alaska R. Corp., Exemption* (STB, Jan. 5, 2010, No. FD 34658) 2010 WL 24954, p. * 1; *California High-Speed Rail Authority, Exemption*, *supra*, 2013 WL 3053064; *South Carolina Division of Public Railways d/b/a Palmetto Railways, Exemption* (STB, Sept. 10, 2013, No. FD 35762) 2013 WL 4879234; *State of North Carolina, Exemption* (STB, Apr. 15, 1998, No. FD 33573) 1998 WL 191270; *Morristown & Erie Railway, Inc., Certificate* (STB, June 22, 2004, No. FD 34054) 2004 WL 1387314, pp. * 3, * 4 [discussing STB regulations implementing NEPA in context of railroad owned by the state and operated by a county].)

We believe this analysis fails to grapple with the status of the state as the owner of the railroad line, and the related question of the freedom of action afforded to owners under the deregulatory aspect of the ICCTA. It also fails to abide by the presumption established in *Nixon* and *Gregory* — that federal preemption does not trench on essential state sovereignty and self-governance without unmistakably clear language to that effect — and mistakenly suggests that just because Congress has *power* to assert preemptive control over an area of commerce, the existence of such power means that it necessarily *has* preempted control even as to areas of traditional state sovereignty. We believe the analysis must be more nuanced, and that the appropriate presumptions must be invoked. Where owners are free from regulation, this freedom belongs to both public and private owners. When there is state ownership, we do not believe it constitutes regulation when a state applies state law to govern how its own state subsidiary will act within the area free of STB and ICCTA regulation.

We acknowledge that the STB apparently applies the same sweeping preemption to state and local environmental rules even when the rail carrier is publicly owned. (See *North San Diego*, *supra*, 2002 WL 1924265, pp. * 5, * 6 [publicly owned rail carrier could not be required to obtain a coastal development permit under the California Coastal Act or to prepare an environmental report prior to construction of a passing track].) And in a divided opinion now on appeal, the STB concluded specifically that the ICCTA preempts any application of CEQA to what appears to be a publicly owned high-speed rail project in California. (*California High-Speed Rail Authority, Petition*, *supra*, 2014 WL 7149612, p. * 7.) Although the California High-Speed Rail Authority in that case had petitioned only for a declaration that the ICCTA preempts injunctive relief under CEQA that could prevent or delay construction of the line, and though the authority observed that it did not seek preemption of other remedies such as an order requiring a revised EIR or additional mitigation so long as there would be no work stoppage, the STB majority filed a much broader decision. It concluded that CEQA is "categorically

preempted" because its application to new rail construction would impinge on the "[STB]'s exclusive jurisdiction over rail transportation" and constitute an attempt "to regulate a project that is directly regulated by the [STB]." (*Ibid*.) The STB majority held that CEQA is, in fact, an environmental permitting or preclearance provision that should be entirely preempted as to railroads, relying largely on *Auburn*, *supra*, 154 F.3d 1025, and the Court of Appeal decision in the present case. A dissent to the STB's decision objected that it was unnecessarily broad and that the authority should be held to its prior voluntary commitments to follow CEQA. (*California High-Speed Rail Authority, Petition*, *supra*, at p. * 13 (dis. statement of Begeman, Comr.).)[8] But these decisions on the part of the STB did not consider the deregulatory aspect of the ICCTA and the different way in which deregulation affects public and private rail lines. We are not bound to follow them.

### c. The market participant doctrine

There is another interpretive presumption, namely the market participant doctrine, that plaintiffs assert would lead to a conclusion that there should be no preemption of CEQA here. The doctrine acknowledges that in some circumstances, states may be acting not as regulators of *others*, but as participants in a marketplace who *themselves* need to deal with private parties to obtain services or products. In this proprietary capacity they generally should have the same freedom as private actors in the market, just as they must ordinarily carry the same burdens. (*Reeves, Inc. v. Stake* (1980) 447 U.S. 429, 439 (*Reeves*) [state, which owned and operated a cement plant, was permitted to sell preferentially to in-state private purchasers; "state proprietary activities may be, and often

---

[8] A petition for reconsideration and request for stay was denied on the ground that a majority of the STB could not agree on its disposition. (*California High-Speed Rail Authority*, *Petition* (STB, May 4, 2015, No. FD 35861) 2015 WL 2070594.) The matter is pending on appeal in the United States Court of Appeals for the Ninth Circuit.

60

are, burdened with the same restrictions imposed on private market participants. Evenhandedness suggests that, when acting as proprietors, States should similarly share existing freedoms from federal constraints, including the inherent limits of the Commerce Clause" (fn. omitted)].)

Whereas the commerce clause of the federal Constitution implies a limitation on state authority to interfere with interstate commerce, "either through prohibition or through burdensome regulation" (*Hughes v. Alexandria Scrap Corp.* (1976) 426 U.S. 794, 806), at the same time the Supreme Court has recognized the importance of state sovereignty in the market sphere as well. The high court has cautioned that notwithstanding the scope of Congress's authority under the commerce clause, "[r]estraint in this area is . . . counseled by considerations of state sovereignty, the role of each State ' "as guardian and trustee for its people," ' [citation], and 'the long recognized right of trader or manufacturer, engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.' [Citation.]" (*Reeves*, *supra*, 447 U.S. at pp. 438-439, fns. omitted.)

The high court has cautioned that whereas the market participant doctrine acknowledges that a state can influence a discrete area of economic activity in which it participates, the doctrine does not afford "*carte blanche* to impose any conditions that the State has the economic power to dictate, and does not validate any requirement merely because the State imposes it upon someone with whom it is in contractual privity. [Citation.] [¶] The limit of the market-participant doctrine must be that it allows a State to impose burdens on commerce within the market in which it is a participant, but allows it to go no further. The State may not impose conditions, whether by statute, regulation, or contract, that have a substantial regulatory effect outside of that particular market." *South-Central Timber Dev. v. Wunnicke* (1984) 467 U.S. 82, 97-98.)

Here, of course, we do not simply confront the inherent or implied limits imposed by the commerce clause on state regulation, but an express preemption provision. The

market participant doctrine applies, however, in both situations.  And when there is a preemptive federal statute, a *presumption* as to its proper interpretation arises from the market participant doctrine.

A congressional preemption clause ordinarily displaces *regulatory* action on the part of states, but the high court has held that it is unlikely that Congress also meant to reach the *proprietary* conduct of the states.  (*Boston Harbor*, *supra*, 507 U.S. at pp. 231-232; *Wisconsin Dept. of Industry v. Gould Inc*. (1986) 475 U.S 282, 290 (*Gould*).)  At the same time, reviewing courts must remain aware of the special power of the state in the marketplace.  The high court in *Gould*, *supra*, 475 U.S. 282, for example, acknowledged that even state purchasing decisions involving private contractors may in some circumstances have such an impact in the marketplace as to be regulatory.  (*Id*. at p. 290.)  Thus in *Gould*, a Wisconsin statute under which state purchasing agents were barred from expending state funds to contract with private employers who had repeatedly violated the National Labor Relations Act (NLRA) was essentially regulatory and therefore was preempted under the NLRA.  The state law imposed a "supplemental sanction" on NLRA violations by private employers (*id*. at p. 288), and was inconsistent with congressional intent to prevent states from "providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act."  (*Id*. at p. 286.)

But even in the context of the NLRA and state contracts with private actors, the high court has confirmed the vitality of the market participant doctrine.  Under certain circumstances involving a state as owner of property or purchaser of goods or services, the high court has acknowledged that the public entity may be permitted to "manage its *own property* when it pursues its purely proprietary interests . . . *where analogous private conduct would be permitted*" and is not seen thereby to be engaging in regulatory conduct.  (*Boston Harbor*, *supra*, 507 U.S. at p. 231, italics added.)  "When a State owns and manages property, for example, it must interact with private participants in the

62

marketplace. In so doing, the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to State *regulation*." (*Id*. at p. 227.)

The Supreme Court in *Boston Harbor* distinguished *Gould*, *supra*, 475 U.S. 282, explaining that the *Gould* rule addressed a state agency's attempt, through limitations on state expenditures, to compel NLRA compliance *on the part of a private employer* — a matter "unrelated to the employer's performance of contractual obligations to the State" but rather demonstrating an intent to deter NLRA violations. (*Boston Harbor*, *supra*, 507 U.S. at p. 229.)

The high court in *Boston Harbor* also pointed out that it was merely permitting the public entity to *act in the same way any other proprietor could act*. The disputed contract in that case was between public and private entities and involved a development project. The contract's prehire provisions, challenged as regulatory, would actually be permitted under the NLRA in *private* contracts in the construction industry, and the same freedom was contemplated when the public entity acted as a proprietor and market participant. (*Boston Harbor*, *supra*, 507 U.S. at p. 231.) The court said: "To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity as purchaser should be permitted to do the same." (*Ibid*., italics omitted.)

*Boston Harbor* reflects a situation in which the state can interact in the marketplace in the same way as a private actor without being considered as engaging in preempted regulatory conduct. By contrast, when the state engages with private persons in the marketplace with tools that are *not* available to private actors, the high court has viewed this as regulatory, and therefore the state's action will be preempted. (*American Trucking*, *supra*, ___ U.S. ___, ___ [133 S.Ct. at p. 2103] [federal law preempts a municipal entity's requirement of its private lessees that they impose certain contractual terms on private parties on pain of potential misdemeanor prosecution].)

Unlike plaintiffs, we do not find the market participant doctrine fully on point, because it ordinarily is used to analyze preemption when a state interacts with private parties as a participant in a private marketplace for goods, labor, or services. When a state engages in the private marketplace on terms available to any other proprietor, it may be presumed that such conduct is not regulation in the sense ordinarily meant by federal preemption provisions. Here, by contrast, our focus is not on the state's interactions with the private railroad marketplace, or even on its interactions with its private lessee, NWPCo, but on the state's ability to govern the state's own subsidiary, NCRA — the governmental subdivision of the state through which the state proposes to enter into and engage with the railroad marketplace.

Nevertheless, elements of the case law concerning the doctrine are instructive. One useful element is related to our earlier discussion of *Nixon*, *supra*, 541 U.S. 125, and *Gregory*, *supra*, 501 U.S. 452, in that, similarly, it is based in part on the presumption that Congress will not interfere lightly with state sovereignty. Furthermore, the market participant doctrine also instructs, in part, that because states operating in a private marketplace are subject to the same *burdens* imposed by Congress on private proprietors, courts will presume that Congress would afford states, as proprietors, the same *freedom*s as private proprietors. These ideas are useful because in a sense, application of CEQA is not solely a matter of self-governance by the state. CEQA can be seen as an expression of how the state, as proprietor, directs that a state enterprise will be run — an expression that can be analogized to private corporate bylaws and guidelines governing corporate subsidiaries. To the extent a private corporate parent would have a zone of freedom under the ICCTA to govern how its subsidiaries will engage in the railroad business — including the freedom to direct them to undertake environmental fact finding as a condition of approving or going forward with their projects — the state presumably has the same sphere of freedom of action.

64

To make this point more concrete, we provide a hypothetical example. A private corporate conglomerate might require its subsidiaries, including its rail subsidiary, to perform environmental studies to discover what climate impacts a proposed project may have, to identify liabilities in the event of the adoption of a federal carbon tax or, on the asset side of the ledger, the availability of greenhouse gas credits for a project with climate benefits in the event of the establishment of a broad cap-and-trade system. A corporate conglomerate could make the results of environmental study one element of the cost-benefit analysis it requires of its subsidiary or an element of its own retained control over the subsidiary. To ensure accomplishment of its own sustainability goals, or even as a matter of public relations, a corporation, as part of its internal governance policies or its bylaws, could adopt a process that permitted shareholder or stakeholder challenges to its handling of the environmental review process. In our view, the application of CEQA to NCRA proceedings and decisions would perform a similar decisionmaking function and afford similar enforcement mechanisms. We see little reason to suppose that when Congress forbade states to regulate rail transportation, it meant to prevent states, as owners of railroad lines, to have the freedom of action we believe would be retained by private businesses under the ICCTA.[9]

---

[9]      The Court of Appeal in the present case rejected plaintiffs' reliance on the market participant doctrine because petitioner's suit to enforce CEQA was not itself a proprietary activity in the marketplace: "NCRA, a political subdivision of the state, undertook a project to reopen the Russian River Division of the line. As part of that project, it prepared an EIR, which is now challenged by [plaintiffs] as inadequate. Even if the project to reopen the line is viewed as proprietary and the initial decision to prepare the EIR a component of this 'proprietary' action, a writ proceeding by a private citizen's group challenging the adequacy of the review under CEQA is not a part of this proprietary action." We do not believe that the market participant doctrine applies solely to enforcement actions that are themselves literally proprietary or commercial conduct in the market. This was certainly not the case in *Boston Harbor*, *supra*, 507 U.S. 218, for example. Rather, what is critical is whether the state is engaged in proprietary or

*(Footnote continued on next page)*

### F.  NWPCo

Despite our conclusion concerning NCRA, we agree with the Court of Appeal that CEQA causes of action cannot be the basis for an injunctive order directed specifically at NWPCo to halt NWPCo's freight operations — a form of relief that falls within plaintiffs' prayer.  Such an application of state law would be tantamount to the operation of state environmental preclearance rules that the *Auburn* court and others have agreed cannot be used to halt railroad operations pending compliance.  (See, e.g., *Auburn*, *supra*, 154 F.3d 1025.)  The *Gregory-Nixon* presumption regarding congressional intent would not be fully applicable, either, since the order directly restraining NWPCo from operating freight service pending CEQA compliance would not involve simply the state's autonomy and control over its subdivisions, but would constitute use of state law to restrict operations by a private rail carrier — a classic example of state regulation.

---

*(Footnote continued from previous page)*

essentially regulatory conduct, with special attention to whether the same enforcement tools would be available to private parties.

The Court of Appeal also implied that the doctrine can be applied solely as a shield by a state seeking to *avoid* preemption, and not as a sword for citizens seeking to enforce state law.  As our discussion above indicates, however, the market participant doctrine is an aspect of a preemption question, which is a question of law.  (See *Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1089, fn. 10 [preemption as question of law].)  Application of the market participant doctrine turns on congressional intent underlying the preemption clause under review, and on whether the state is involved in essentially regulatory behavior.  Because these questions of law simply lead a court to the proper interpretation of a federal statute, we are not persuaded the market participant doctrine cannot be *raised* simply because plaintiffs are not a state or local entity wishing to *shield* assertedly proprietary activity from federal preemption.  Indeed, the Court of Appeal's interpretation would lead to the anomaly that the scope of the federal enactment's preemption would turn on the litigation strategy of individual states.  It seems unlikely that the ICCTA's purpose contemplated preempting local law in one state but not preempting an identical statute in another state, based merely on the state's appearance or nonappearance in litigation.

Nor would the market participant doctrine apply to prevent preemption. Even if the state is a participant in the railroad market, when the state uses enforcement mechanisms that would not be available to a private party, this ordinarily constitutes regulation. The mechanism sought to be used here — public entity proceedings on a project pursuant to CEQA — is not a mechanism that private market actors could create and require of others. That is, although a private actor, by contract, could condition performance on compliance with specified environmental norms, that private actor would be unable, even by contract, to create and implement a system of *government* proceedings. Only the government can create and administer such a system. In this way, application of CEQA to enjoin NWPCo from operating rail service pending NCRA's CEQA compliance would run afoul of the teaching of *American Trucking*. This, like the possibility of criminal sanctions in that case, is not a tool "that the owner of an ordinary commercial enterprise could mimic." (*American Trucking*, *supra*, ___ U.S. at p. ___ [133 S.Ct. at p. 2103].) Nor does plaintiffs' reliance on the *Engine Manufacturers* decision assist them, since that decision permitted state control over the state's own internal purchasing decisions, but did not extend to permitting regulation of private third parties. (*Engine Manufacturers*, *supra*, 498 F.3d at pp. 1045-1046, 1048.) Thus it appears that plaintiffs cannot rely upon CEQA as a basis for an injunction directed at NWPCo to halt its operations. Whether NWPCo would be able to carry on with service despite the application of CEQA to NCRA is a question that is beyond the scope of this case. We also agree with the Court of Appeal that in the current litigation, plaintiffs did not preserve any contract claim.

At the same time, the conclusion that a CEQA cause of action cannot be the basis for an order halting NWPCo's operations does not require us to conclude CEQA is also preempted as applied to NCRA in this case. Even if CEQA is preempted as applied to halt NWPCo's freight operations because in that context CEQA is essentially regulatory, the application of CEQA, as a matter of self-governance, to the state's own railroad

67

project is not.  This result is evident as a matter of legislative intent, since CEQA contains a severability clause that is written in broad terms:  "If any provision of this division *or the application thereof to any person or circumstances* is held invalid, such invalidity shall not affect other provisions or applications of this division which can be given effect without the invalid provision or application thereof, and to this end the provisions of this division are severable."  (Pub. Resources Code, § 21173, italics added; cf. *NFIB v. Sebelius* (2012) 567 U.S. 519 [giving effect to a similarly worded severability provision].)  The severability clause establishes a presumption that the Legislature intended that the invalid (here, the preempted) applications be severed from the valid (nonpreempted) ones.  Insofar as CEQA governs projects "directly undertaken" by public entities (Pub. Resources Code, § 21065, subd. (a)), its provisions appear to be capable of operating independently.  And to sever the preempted applications of CEQA from the nonpreempted applications is consistent with our repeated recognition that "CEQA is to be interpreted 'to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Mountain Lion Foundation*, *supra*, 16 Cal.4th at p. 112.)

Applying CEQA and its remedies to NCRA (but not to NWPCo) may have some impact on the private party, but this is merely derivative of the state's efforts at self-governance in this marketplace.  We see the two entities as distinct for the purposes of preemption, at least in circumstances where the ICCTA leaves a regulatory hole which owners are free to exploit to their own advantage.

### III.  Conclusion

The ICCTA preempts state regulation of rail transportation.  In this case, the application of CEQA to NCRA would not be inconsistent with the ICCTA and its preemption clause.  This is both because we presume Congress does not intend to disrupt state self-governance without clear language to that effect, and because the ICCTA leaves a relevant zone of freedom of action for owners that the state, as owner, can elect to act in through CEQA.  We conclude that the judgment of the Court of Appeal should be reversed and the matter remanded for further proceedings consistent with this opinion.

CANTIL-SAKAUYE, C. J.

WE CONCUR:

WERDEGAR, J.
CHIN, J.
LIU, J.
CUÉLLAR, J.
KRUGER, J.

69

**CONCURRING OPINION BY KRUGER, J.**

I agree with the majority that, in the context of the activities of a public rail authority, the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) is not categorically preempted as a "regulation of rail transportation" within the meaning of the ICC Termination Act of 1995 (ICCTA; 49 U.S.C. § 10501(b)). As it applies in this context, CEQA represents a set of obligations the State of California has voluntarily assumed in conducting its own operations, and it functions as a rule of internal state governance that the North Coast Railroad Authority — much as every other California public agency — must follow with respect to all projects it undertakes. (See, e.g., Pub. Resources Code, §§ 21001.1, 21065, subd. (a), 21150, 21151.) I agree with the majority that the Congress that enacted the ICCTA could not have intended to broadly displace state laws governing how states and their subdivisions carry out their own projects. (See maj. opn., *ante*, at pp. 45–65.)

This decision clears the way for the courts below to begin considering the merits of plaintiffs' CEQA claims, which the courts had previously found to be preempted by the ICCTA as a categorical matter. That is not to say that the ICCTA is irrelevant to the proceedings on remand, however. The parties and amici curiae have argued that particular CEQA remedies might be preempted by the ICCTA to the extent the remedy is one that unreasonably interferes with the jurisdiction of the Surface Transportation Board, which has authorized service

1

over the rail line in question.  (Cf., e.g., *Wedemeyer v. CSX Transportation, Inc.* (7th Cir. 2017) 850 F.3d 889, 895 [a remedy may be preempted " 'as applied' . . . if [it] would have the effect of preventing or unreasonably interfering with railroad transportation"]; *California High-Speed Rail Authority, Petition* (STB, Dec. 12, 2014, No. FD 35861) 2014 WL 7149612, p. *8 [opining that even voluntary agreements may be preempted to the extent they unreasonably interfere with interstate commerce or rail operations].)  I do not read the majority opinion to foreclose such arguments on remand.  (Cf., e.g., maj. opn., *ante*, at pp. 47, 67.)

With these observations, I join the majority opinion.


**KRUGER, J.**

**DISSENTING OPINION BY CORRIGAN, J.**

I respectfully dissent. The majority properly explains why any application of the California Environmental Quality Act (CEQA) that interrupts rail service would be preempted by the ICC Termination Act (ICCTA). (Maj. opn., *ante*, at pp. 34-41; see Pub. Resources Code, § 21000 et seq. (CEQA); 49 U.S.C. § 10101 et seq. (ICCTA).) The majority acknowledges that no CEQA remedy can be imposed on the Northwestern Pacific Railroad Company (NWPCo) in this case. (Maj. opn., *ante*, at pp. 66-67.) However, it reasons that as applied to the North Coast Railroad Authority (NCRA), a state agency, CEQA is not a "regulation" but a mere act of "self-governance." (*Id*. at p. 20; see *id*. at pp. 45-65.) I do not follow that logic.

There is no difference in CEQA procedures as they apply to projects undertaken by public agencies, as opposed to private projects over which an agency has power of approval.[1] The proposition that a law of general application

---

[1]    A project subject to CEQA is "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following:
   "(a) An activity directly undertaken by any public agency.
   "(b) An activity undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies.
   "(c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (Pub. Resources Code, § 21065.)

may be considered a "regulation" of private activity, but not of public activity in the same sphere, appears to be unsupported by precedent.[2] Nor does the majority explain how it is that the state is free to "govern" itself by applying CEQA when it undertakes a rail project, something ordinarily done by the private sector, but not when exercising its permitting authority over a private rail project, which is a quintessentially governmental function. The majority emphasizes the state's "zone of autonomy" as a railroad owner. (Maj. opn., *ante*, at p. 47.) However, neither NCRA nor any of the other state agencies involved in this case subscribe to the self-governance theory. The majority's approach forces the state to undertake a burden no private railroad owner must bear.

The majority recognizes that if a state decides to enter the railroad business, it is subject to the same federal regulations as private carriers. (*Hilton v. South Carolina Public Railways Comm'n* (1991) 502 U.S. 197, 203; *Transportation Union v. Long Island R. Co.* (1982) 455 U.S. 678, 685, 687-689; *California v. Taylor* (1957) 353 U.S. 553, 566-567; maj. opn., *ante*, at pp. 57-58, fn. 7.) Nevertheless, it concludes that ICCTA applies differently to public and private rail operators. It attempts to minimize its disparate treatment of public operators by reasoning that a private operator might choose to subject itself to an environmental review process, and permit its shareholders or stakeholders to challenge its handling of that process. (Maj. opn., *ante*, at p. 65.) Hypothetically, a corporation might do that. But a challenge that had the effect of interfering with the operator's obligations as a common carrier would be subject to Surface Transportation Board (STB) regulation. (See maj. opn., *ante*, at p. 24.) And if the challenge were

---

[2]    Neither *Gregory v. Ashcroft* (1991) 501 U.S. 452, nor *Nixon v. Missouri Municipal League* (2004) 541 U.S. 125, nor the "market participant doctrine" line of cases (see maj. opn., *ante*, pp. 60-64) stands for the idea that the same law may be a "regulation" as applied to a private party, but "self-governance" as applied to a public agency.

2

brought in court, it would be barred by ICCTA's specification that "the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." (49 U.S.C. § 10501(b).)

The majority can avoid the consequences of its rule here only because NCRA, despite its status as a common carrier, does not directly operate the Russian River line. It has transferred operational responsibility to its franchisee, NWPCo. However, no escape from the majority's holding will be available to public entities who operate rail lines themselves, or who are sued at an early stage of a railroad project, before a franchisee is in place. In such cases, today's holding will displace the longstanding supremacy of federal regulation in the area of railroad operations by allowing third party plaintiffs to thwart or delay public railroad projects with CEQA suits. Such an outcome is both unfair to public entities and inimical to the deregulatory purpose of ICCTA. (See maj. opn., *ante*, at pp. 27-29.)

Furthermore, as the majority recognizes, the holding in this case is in direct conflict with the stated views of the STB. (Maj. opn., *ante*, at pp. 59-60.) I question the wisdom of creating such a conflict, based not on settled law but on an entirely novel theory construing regulation as a form of "self-governance."

CORRIGAN, J.

3

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Friends of the Eel River v. North Coast Railroad Authority
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 230 Cal.App.4th 85
**Rehearing Granted**

_____

**Opinion No.** S222472
**Date Filed:** July 27, 2017
_____

**Court:** Superior
**County:** Marin
**Judge:** Faye D. Opal and Roy O. Chernus

_____

**Counsel:**

Shute Mihaly & Weinberger, Ellison Folk, Amy J. Bricker, Edward T. Schexnayder and Laura D. Beaton for Plaintiff and Appellant Friends of the Eel River.

Law Offices of Sharon E. Duggan, Sharon E. Duggan; Klamath Environmental Law Center, William Verick; Environmental Law and Justice Clinic at Golden Gate University School of Law, Helen H. Kang, Ashley Pellouchoud; Environmental Law Clinic and Mills Legal Clinic at Stanford Law School and Deborah A. Sivas for Plaintiff and Appellant Californians for Alternatives to Toxics.

Law Offices of Stuart M. Flashman and Stuart M. Flashman for Town of Atherton, California Rail Foundation, Transportation Solutions Defense and Education Fund, Community Coalition on High-Speed Rail and Patricia Hogan-Giorni as Amici Curiae on behalf of Plaintiffs and Appellants.

Kurt R. Wiese, Barbara Baird and Brian C. Bunger for South Coast Air Quality Management District and Bay Area Air Quality Management District as Amici Curiae on behalf of Plaintiffs and Appellants.

David Pettit, Melissa Lin Perrella and Ramya Sivasubramanian for Sierra Club, Coalition for Clean Air, Natural Resources Defense Council, Planning and Conservation League and Communities for a Better Environment as Amici Curiae on behalf of Plaintiffs and Appellants.

Clare Lakewood and Kassia R. Siegel for Center for Biological Diversity as Amici Curiae on behalf of Plaintiffs and Appellants.

Holder Law Group and Jason W. Holder for Madera County Farm Bureau and Merced County Farm Bureau as Amici Curiae on behalf of Plaintiffs and Appellants.

Frank G. Wells Environmental Law Clinic at UCLA School of Law and Sean B. Hecht for Natural Resources Defense Council, Planning and Conservation League and Sierra Club as Amici Curiae on behalf of Plaintiffs and Appellants.

**Page 2 – S222472 – counsel continued**

**Counsel:**

Fredric Evenson and Brian Acree for Ecological Rights Foundation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Neary & O'Brien and Christopher J. Neary for Defendants and Respondents North Coast Railroad Authority and Board of Directors of North Coast Railroad Authority.

Cox, Castle & Nicholson, R. Chad Hales, Andrew B. Sabey, Linda C. Klein, Stephanie R. Marshall; Law Office of Douglas H. Bosco and Douglas H. Bosco for Real Party in Interest and Respondent.

Kamala D. Harris and Xavier Becerra, Attorneys General, Robert W. Byrne, Assistant Attorney General, Annadel A. Almendras, Marc N. Melnick, Myung J. Park and Carolyn Nelson Rowan for California Environmental Protection Agency, California Natural Resources Agency and certain of their Departments and Boards as Amici Curiae on behalf of Defendants and Respondents and Real Party Interest and Respondent.

Kamala D. Harris and Xavier Becerra, Attorneys General, John A. Saurenman, Assistant Attorney General, Deborah M. Smith and Danae J. Aitchison, Deputy Attorney General, for California High-Speed Rail Authority as Amicus Curiae on behalf of Defendants and Respondents and Real Party Interest and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Amy J. Bricker
Shute Mihaly & Weinberger
396 Hayes Street
San Francisco, CA  94102-4421
(415) 552-7272

Helen H. Kang
Environmental Law and Justice Clinic at Golden Gate University School of Law
536 Mission Street
San Francisco, CA  94105-2968
(415) 442-6647

Andrew B. Sabey
Cox, Castle & Nicholson
50 California Street, Suite 3200
San Francisco, CA  94111
(415) 262-5100